2011 OK CR 12

**Kevin Ray UNDERWOOD, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

No. D–2008–319.

Court of Criminal Appeals of Oklahoma.

March 25, 2011.

L. Wayne Woodyard, Matthew D. Haire, G. Lynn Burch, Norman, OK, attorneys for defendant at trial.

Greg Mashburn, District Attorney, Susan Caswell, Assistant District Attorney, Norman, OK, attorneys for the State at trial.

William H. Luker, Lee Ann Jones Peters, Norman, OK, attorneys for appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Jennifer J. Dickson, Assistant Attorney General, Oklahoma City, OK, attorneys for the State on appeal.

## OPINION

C. JOHNSON, Judge.

¶ 1 Appellant, Kevin Ray Underwood, was charged in McClain County District Court (Case No. CF2006–102) with First Degree Murder (21 O.S.Supp.2004, § 701.7(A)). The State alleged three aggravating circumstances in support of the death penalty. The district court granted Appellant's request for a change of venue, and the case was transferred from McClain County to Cleveland County (Case No. CF–2007–513). Jury trial was held February 19 through March 7, 2008 before the Honorable Candace L. Blalock, District Judge. The jury found Appellant guilty as charged. Before the capital sentencing phase of the trial began, the State dismissed one of the three aggravating circumstances it had alleged. The jury rejected a second aggravating circumstance, but did

find that the murder was especially heinous, atrocious, or cruel, and recommended a sentence of death.[1] Formal sentencing was held April 3, 2008. Appellant timely appealed the verdict to this Court.[2]

## FACTS

¶ 2 Appellant was charged with murdering ten-year-old Jamie Bolin on April 12, 2006, in Purcell, Oklahoma. Appellant lived alone in the same apartment complex where Jamie lived with her father, Curtis Bolin. Due to her father's work schedule, Jamie was typically home alone for a period of time after school. On the day in question, Jamie played in the school library with a friend for a short time before going home. She was never seen alive again.

¶ 3 Police, firefighters, and a host of citizen volunteers began a search for Jamie. The day after Jamie's disappearance, the Federal Bureau of Investigation added over two dozen people to the effort. On April 14, 2006, two days after Jamie was last seen, police set up several roadblocks around the apartment complex where she lived, seeking leads from local motorists. Around 3:45 p.m. that day, FBI Agent Craig Overby encountered a truck driven by Appellant's father at one of the roadblocks; Appellant was a passenger in the truck. Appellant's father told Overby that they had heard about the disappearance, and that in fact, Appellant was the girl's neighbor. From speaking with other neighbors at the apartment complex, Overby knew that a young man living there may have been the last person to see Jamie. Overby asked

if Appellant would come to the patrol car to talk for a moment, and Appellant agreed, while his father waited in the truck. In the patrol car, Appellant made statements that piqued Overby's interest.[3] Overby asked Appellant if he would come to the police station for additional questioning. Again, Appellant agreed, and Overby assured Appellant's father that he (Overby) would give Appellant a ride home.

¶ 4 At the police station, Appellant was interviewed by Agent Overby and Agent Martin Maag. Appellant told them about seeing Jamie on April 12, and discussed his activities on that day and other matters. At the conclusion of this interview, which lasted less than an hour, the agents asked Appellant if they could search his apartment. Appellant agreed. The agents accompanied Appellant to his apartment around 5:00 p.m. While looking around the apartment, Overby saw a large plastic storage tub in Appellant's closet; its lid was sealed with duct tape. Appellant saw Overby looking at the tub, and volunteered that he kept comic books in it; he said that he had taped the lid to keep moisture out. Overby asked if he could look inside the tub, and Appellant agreed. When Overby pulled back a portion of the tape and lifted a corner of the lid, he saw a girl's shirt—and realized that it matched Appellant's description of the shirt Jamie Bolin was wearing on the day she disappeared.[4] When Overby commented that he saw no comic books in the tub, Appellant interjected, "Go ahead and arrest me." Overby immediately responded, "Where is she?" Appellant replied, "She's in there. I hit her and

1. The State had initially alleged that the murder was committed to avoid lawful arrest or prosecution (21 O.S.2001, § 701.12(5)); that the murder was especially heinous, atrocious, or cruel (21 O.S.2001, § 701.12(4)); and that there existed a probability that Appellant would commit other criminal acts of violence such that he was a continuing threat to society (21 O.S.2001, § 701.12(7)). The State ultimately dismissed the "murder to avoid arrest" allegation, and the jury rejected the "continuing threat" allegation.

2. Appellant filed his brief-in-chief, and an application for evidentiary hearing on his ineffective-counsel claims, on June 3, 2009. The State filed its response brief on October 30, 2009. Appellant filed a reply brief on November 19, 2009. Oral argument was held October 12, 2010.

3. At trial, Overby testified: "He told me that he was afraid that he was considered a suspect because he'd been hanging around outside his apartment a lot during the last couple of weeks.... He said he was the last person to see Jamie before she disappeared, and that the media reports of the clothing that she was wearing when she became missing were incorrect."

4. Overby testified: "[D]uring the earlier interview, Mr. Underwood told me that the media reports about what Jamie was last seen wearing were wrong, that he had actually seen her wearing a blue shirt. And then I saw the blue shirt inside the box or the tub."

chopped her up." Appellant then became visibly upset, began hyperventilating, and exclaimed, "I'm going to burn in Hell." He was placed under arrest and escorted out to the agents' vehicle. Agent Overby summoned local authorities to secure the scene.

¶ 5 Back at the police station, Appellant was advised of his right to remain silent, and his right to the assistance of counsel during any questioning, consistent with *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Because he asked for a lawyer, the interview was concluded. About fifteen minutes later (approximately 5:45 p.m.), police approached Appellant and asked if he would reaffirm, in writing, his original verbal consent to a search of his apartment. Appellant agreed, and spent the next few hours sitting in a police lieutenant's office. He conversed with various officers who were sent to guard him, and made some incriminating statements during that time.

¶ 6 Around 9:30 p.m. that evening, Appellant asked to speak with the two FBI agents he had initially talked to (Overby and Maag). Because Appellant had previously asked for counsel, OSBI Agent Lydia Williams visited with him to determine his intentions. Agent Williams reminded Appellant that he had earlier declined to be questioned, and explained that because of that decision, police could not question him any further. Appellant emphatically replied that he wanted to talk to the agents. Around 10:15 p.m., Agents Overby and Maag interviewed Appellant at the police station. Before questioning began, Overby reminded Appellant of his *Miranda* rights, and Appellant signed a written form acknowledging that he understood them and waived them. When asked if anyone had offered him anything in exchange for agreeing to talk, Appellant replied that one of the officers had predicted things would go better for him if he cooperated. Besides acknowledging his waiver of *Miranda* rights, Appellant also signed another written consent to a search of his apartment. A video recording and transcript of the interview that followed, which lasted about an hour, was presented to the jury at trial and is included in the record on appeal.

¶ 7 In the interview, Appellant describes how he had recently developed a desire to abduct a person, sexually molest them, eat their flesh, and dispose of their remains. He explains in considerable detail how he attempted to carry out this plan on Jamie Bolin, whom he had decided was a convenient victim. Appellant stated that he invited Jamie into his apartment to play with his pet rat. Once Jamie was inside, Appellant hit her on the back of the head several times with a wooden cutting board; she screamed in pain and begged him to stop. Appellant proceeded to suffocate the girl by sitting on her and placing his hand across her face. Appellant told the agents that this was not an easy task, and that fifteen to twenty minutes passed before she succumbed. Appellant claimed he then attempted to have sexual relations with the girl's body, but was unable to perform. He then moved her body to the bathtub and attempted to decapitate it with a knife, but was unsuccessful at that task as well. Frustrated, Appellant wrapped Jamie's body in plastic sheeting and placed it in a large plastic container which he hid in his closet. Appellant also dismantled Jamie's bicycle and hid it inside his apartment, to make it look as if she had left the apartment complex.

¶ 8 Jamie Bolin's remains were taken to the Medical Examiner's office for an autopsy. The Medical Examiner noted bruises to the back of the girl's head, consistent with Appellant's claim that he hit her forcefully with a cutting board. The examiner also noted petechia in the girl's eyes, and curved marks on her face, consistent with Appellant's description of how he had suffocated her. The most pronounced wound on the body was a very deep incision to Jamie's neck, which was also consistent with the injuries Appellant admitted to inflicting. The Medical Examiner also noted trauma to the girl's genital area, including tearing of the hymen. However, the Medical Examiner could not say that Jamie was alive, or even conscious, when her neck was cut or when she was sexually assaulted. The official cause of death was declared to be asphyxiation.

¶ 9 In the punishment stage of the trial, the State presented brief victim-impact testi-

mony from Jamie Bolin's parents. It incorporated the testimony from the guilt stage to show that the murder was especially heinous, atrocious, or cruel. The defense presented extensive evidence in mitigation of sentence, including the testimony of family, friends, and three experts who had evaluated Appellant's mental health. In rebuttal, the State presented its own mental-health expert, who had reviewed the findings of the defense experts. The State's expert did not disagree with the defense experts' diagnoses, and concurred with many of their findings, but disagreed on some points and explained why, in his opinion, Appellant constituted a continuing threat to society. In the end, the jury rejected the "continuing threat" allegation, but found that the heinous nature of the killing warranted the death sentence.

¶ 10 Additional facts will be presented when relevant to the discussion below.

## DISCUSSION

¶ 11 Appellant raises thirteen propositions of error. Before turning to them, however, we make a few important observations. First, while Appellant did not formally concede his guilt in the murder of Jamie Bolin, but instead required the State to present its evidence on that issue, neither did he seriously contest the guilt-stage evidence against him. In fact, defense counsel told the jury in guilt-stage opening statements that it would probably find Appellant guilty, but that there would be reasons to spare his life.[5] Appellant does not, on appeal, challenge the sufficiency of the evidence to support his conviction. While Appellant does raise a few claims that go to the fairness of the entire trial, in the remaining claims it is generally conceded that any alleged error only affected the punishment stage. Second, as far as the punishment stage goes, the jury was presented with two aggravating circumstances in support of the death penalty, and it rejected one of them. The defense presented substantial evidence regarding Appellant's background, mental health, and prospects as an inmate of a secure facility for the rest of his life. The jury rejected the State's claim that Appellant posed a continuing threat to society; however, it found that the murder of Jamie Bolin was especially heinous, atrocious, or cruel, and that that single aspect of the crime outweighed the mitigating evidence and warranted a sentence of death. With these facts in mind, we turn to Appellant's claims of error.

## I. ADMISSIBILITY OF APPELLANT'S CONFESSION

■ ¶ 12 In Proposition 1, Appellant advances several reasons why incriminating statements he made to police, and the physical evidence that those statements led to, should not have been admitted at his trial. Essentially, he claims that his initial encounter with police at the roadblock, his statements during subsequent interviews, his incriminating statements during the search of his apartment, his recorded confession later that evening, and physical evidence eventually seized from his apartment, were all obtained in violation of the state and federal constitutional protections from unreasonable searches and seizures, and the constitutional privilege against self-incrimination. Appellant filed an extensive motion to suppress before trial, raising each of the claims made here. The trial court held a hearing over several days in January 2008, then issued a written order, setting forth a chronology of relevant events, and detailing its findings of fact and conclusions of law on what evidence would be admissible at the upcoming trial.[6] Appellant timely renewed his motion to suppress at trial. These issues have been preserved for full appellate review. We review the district court's factual findings for clear error; its analysis of applicable law is reviewed *de novo*. *State v. Pope*, 2009 OK CR 9, ¶ 4, 204 P.3d 1285, 1287.

■ ¶ 13 The district court concluded, in substance, (1) that the roadblock where Ap-

---

5. This defense strategy was undertaken with Appellant's understanding and consent, as recorded in an *ex parte* hearing with the court. *See Jackson v. State*, 2001 OK CR 37, ¶¶ 10–16, 41 P.3d 395, 398–99.

6. We commend the district court for the manner in which the hearing was conducted, and for the thoroughness of its findings and conclusions.

pellant first encountered police was not an unreasonable seizure, as it was reasonably tailored to its stated objective; (2) that Appellant's initial statements to police at the roadblock, and later at the police station, including his verbal consent to a search of his apartment, were all voluntarily made in a non-custodial setting; (3) that Appellant's initial confession to Agent Overby at the apartment was admissible, even in the absence of *Miranda* warnings, under the "rescue doctrine"; (4) that Appellant's subsequent arrest, followed by his invocation of his right to counsel, required the suppression of certain incriminating statements he made to various officers over the next few hours, and also invalidated his written consent to a search of his apartment made during that time, but this had no effect on the validity of his previous verbal consent to such a search; (5) that the search warrant, obtained by police later that evening, was not predicated on false or misleading information; and (6) that Appellant voluntarily reinitiated contact with police, asking to talk with particular officers, and that his subsequent interview with Agents Overby and Maag on the night of April 14, 2006 was voluntary and admissible at trial. Appellant challenges all of these conclusions, and we review each claim in turn.

### a. The police roadblock.

¶ 14 Appellant complains that the police roadblock, which led to his initial conversation with police, amounted to an unreasonable seizure under the Fourth Amendment. In determining the reasonableness of seizures that are less intrusive than a traditional arrest, we must balance several competing factors: (1) the gravity of the public concerns served by the seizure, (2) the degree to which the seizure advances the public interest, and (3) the severity of the interference with individual liberty. *Brown v. Texas,* 443 U.S. 47, 50–51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979); *Lookingbill v. State,* 2007 OK CR 7, ¶ 15, 157 P.3d 130, 134. Police may generally establish a roadblock without any individualized suspicion of criminal activity if the purpose is related to motor safety—such as brief checks for driver's licenses or driver sobriety—provided that the

roadblock is sufficiently tailored to that end. *Michigan Dept. of State Police v. Sitz,* 496 U.S. 444, 452–53, 110 S.Ct. 2481, 2486–87, 110 L.Ed.2d 412 (1990). On the other hand, police may not establish roadblocks for "general" interest in crime control, *i.e.,* stopping motorists just to see what illegal activity might be revealed. *Indianapolis v. Edmond,* 531 U.S. 32, 44, 121 S.Ct. 447, 455, 148 L.Ed.2d 333 (2000). But police may, consistent with the Fourth Amendment, briefly detain motorists to seek and disseminate information about a recent crime affecting the area. *Illinois v. Lidster,* 540 U.S. 419, 423, 124 S.Ct. 885, 889, 157 L.Ed.2d 843 (2004). While such "information-seeking" detentions do not involve individualized suspicion of criminal activity, they are designed to be brief in duration; they tend to involve a few general questions of the motorist, and perhaps delivery of a flyer with additional information about the crime being investigated. *Id.* at 424, 124 S.Ct. at 889. If such roadblocks are reasonably tailored to those objectives, they are not unreasonable seizures. *Id.* at 427–28, 124 S.Ct. at 891.

¶ 15 In *Lidster,* the police set up a highway roadblock to find witnesses to, or other information about, a hit-and-run accident that had killed a bicyclist about a week earlier on the same road. The defendant in *Lidster* was arrested at the roadblock on suspicion of driving under the influence of alcohol, and was later convicted of that crime. On appeal in state court, he successfully challenged his conviction on the theory that the roadblock was an unreasonable seizure. However, the United States Supreme Court disagreed. Considering the factors enunciated in *Brown v. Texas,* enumerated above, and noting the "vital role" that the public plays in police investigative work, the Court concluded that the brief delay to motorists, for the purpose of collecting and disseminating information about a recent serious crime in the vicinity, was not an unreasonable seizure under the Fourth Amendment. *Id.* at 422–28, 124 S.Ct at 888–891.

¶ 16 The situation here is similar to the one in *Lidster*—the obvious difference being that the person challenging the roadblock here was actually implicated in the crime

that prompted the roadblock in the first place.[7] That difference, however, is of no constitutional significance, since the legality of a search or seizure is not dependent on the kind of evidence it produces. At the suppression hearing, Agent Mabry sponsored the guidelines used in this case, known as the FBI's "Child Abduction Response Plan." Mabry testified about the procedures he had been trained to use when deploying roadblocks to canvass for witnesses and generate leads in such cases. The district court found nothing unreasonable about the roadblock and, applying the factor analysis from *Brown* and *Lidster,* we reach the same conclusion. First, the public concerns justifying the roadblock were grave—considerably more so than in *Lidster.* All police knew was that a little girl had been reported missing two days before. Time was of the essence; the girl's life might be at stake. Second, the roadblock clearly advanced the public interest of informing people in the area about the girl's disappearance, and asking them about anything suspicious they may have seen. The police set up four roadblocks surrounding the immediate vicinity of the apartment where Jamie lived. They were deployed around the same time of day that Jamie had disappeared, on the belief that many local motorists tend to travel the same routes around the same time each day. Finally, the interference with individual liberty occasioned by the roadblocks was minimal. The plan contemplated no vehicle searches, and the record offers no evidence that any motorist was seriously inconvenienced.

¶ 17 Appellant makes several inconsistent arguments about the roadblock. On the one hand, he claims that the procedures used to implement it did not sufficiently limit officer discretion. He relies on our analysis in *Lookingbill,* which involved a roadblock set

up for an entirely different purpose—checking driver's licenses.[8] we held in *Lookingbill* that public-safety roadblocks (1) should be rationally related to their stated purpose, (2) should be carried out according to guidelines that limit officer discretion and treat all motorists equally, and (3) should strive to minimize invasion of motorist privacy. *Lookingbill,* 2007 OK CR 7, ¶ 27, 157 P.3d at 136. Appellant concedes that the officers in this case were following FBI guidelines, but complains that those guidelines were not restrictive enough. Yet he does not point to any particular action during the agents' encounter with him (or with any other motorist, for that matter) that could be considered unfair, harassing, or unnecessary to the stated objective.

¶ 18 Appellant then acknowledges that the roadblock in this case had a different purpose than the one in *Lookingbill.* Nevertheless, he claims the roadblock fails the criteria considered in *Brown* and *Lidster.* He argues that it was unreasonable to set up roadblocks around the area where Jamie lived and was last seen, because police had no idea if she was still there. This argument is frivolous. With no other information about the girl's whereabouts, it was entirely reasonable for police to inquire of those who might have seen her leaving the area where she was last seen.

¶ 19 After arguing that the roadblock was, logistically, an unreasonable "shot in the dark," Appellant then claims the opposite: that it was really a subterfuge designed to trap him in particular. He suggests that police already suspected him of involvement in Jamie's disappearance, but that they lacked probable cause to arrest him. Police had attempted to question Appellant a day or so before, because neighbors had reported that he claimed to have been the last person

---

7. *Cf. Burns v. Commonwealth,* 261 Va. 307, 541 S.E.2d 872, 883–84 (2001) (implementation of "traffic-canvassing detail," stopping motorists in the vicinity of a recent murder and asking if any suspicious activity had been seen, and which fortuitously resulted in the apprehension of the murderer, did not violate the Fourth Amendment).

8. In *Lookingbill,* the defendant was arrested after contraband was observed in plain view during

the driver's-license check. *Lookingbill,* 2007 OK CR 7, ¶¶ 7–12, 157 P.3d at 133. Although the defendant challenged the propriety of the roadblock, the testimony indicated it was deployed pursuant to rules promulgated by the Oklahoma Highway Patrol and the Department of Public Safety, and no evidence was presented to the contrary. On that record, we affirmed the district court's conclusion that the roadblock was permissible. *Id.* at ¶¶ 21–24, 157 P.3d at 135–36.

to see Jamie alive. Yet there is no indication that, at the time the roadblock was implemented, Appellant was considered anything but a potential witness to a crime. There is also no indication that Appellant was attempting to flee the area, or that police thought as much.[9] More fundamentally, Appellant cites no authority for his insinuation that it is "unreasonable" for police to deploy an information-gathering roadblock if they happen to have some leads that have not yet been exhausted.[10] The very purpose of a *Lidster*-style roadblock is to generate useful leads in a criminal investigation. If, in the process, the police encounter citizens they already wanted to speak with, so much the better. *Lidster* instructs that police may briefly detain motorists in their quest for potential witnesses to serious crimes, provided the means employed are reasonable under the circumstances. The district court was correct in concluding that the police roadblock in this case was reasonable under the Fourth Amendment. *Lidster*, 540 U.S. at 426–27, 124 S.Ct. at 890–891; *Brown*, 443 U.S. at 51, 99 S.Ct. at 2640.

### b. Appellant's initial statements and consent to search apartment.

¶ 20 Next, Appellant claims that all evidence flowing as a direct consequence of the roadblock encounter should be suppressed as the fruit of the poisonous tree. He claims that he was effectively "under arrest" the entire time, because he was not truly free to leave, and therefore, should have been advised of his right to remain silent before any questions were asked of him. *See Miranda*, 384 U.S. at 444–45, 86 S.Ct. at 1612; *Lewis v. State*, 1998 OK CR 24, ¶ 37, 970 P.2d 1158, 1171. We have concluded that the roadblock itself did not create an illegal seizure. To determine whether Appellant was "under arrest" at any time afterward, we consider "how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984).

¶ 21 At the suppression hearing, Agent Overby testified that Appellant volunteered to answer questions at the roadblock, volunteered to go to the police station, and once there, agreed to let Overby search his apartment. Overby testified that on the way to the police station (which was just a few blocks away), he told Appellant he was not under arrest, but was considered an important witness to Jamie's disappearance. Appellant presented no evidence to the contrary. The district court did not err in concluding that Appellant's encounter with police, from the time he met them at the roadblock until he was placed under arrest at his apartment, was consensual. *Andrew v. State*, 2007 OK CR 23, ¶ 72, 164 P.3d 176, 194–95.

### c. Appellant's initial confession and the "rescue doctrine."

¶ 22 Appellant alternatively argues that even if he was not under arrest when he accompanied police on a search of his apartment, he was not free to leave once Agent Overby opened the tub and saw girls' clothing inside. Appellant focuses on the brief period of time between Overby's discovery and Appellant's formal arrest. When Overby saw the clothing, Appellant suddenly exclaimed, "Go ahead and arrest me." Overby

---

**9.** Appellant claims the roadblocks were called off shortly after he agreed to accompany police to the station for further questioning, but concedes that the record is devoid of evidence on this point. Of course, Appellant was arrested for the murder of Jamie Bolin within about ninety minutes after the roadblocks began, and it would seem pointless to have continued them after that time.

**10.** To the extent Appellant is arguing that police hoped to catch the person who abducted Jamie Bolin by use of the roadblock, that much could hardly be denied. Indeed, it seems obvious that police hoped to find Jamie *alive* via use of the roadblock. But Appellant's argument goes beyond this, implying that police wanted to arrest him but lacked probable cause to do so. Because the police used reasonable methods to further a sound investigative objective, Appellant's suggestion that he might already have been considered, by someone, to be a suspect in Bolin's disappearance, even if true, is simply irrelevant. *See Beckwith v. United States*, 425 U.S. 341, 347, 96 S.Ct. 1612, 1616, 48 L.Ed.2d 1 (1976) (a suspect is not in custody for purposes of *Miranda* simply because he is the "focus" of an investigation).

asked, "Where is she?" and Appellant replied, "She's in there. I hit her and chopped her up." Appellant claims that once Overby saw incriminating evidence in the tub, he (Appellant) was surely no longer free to leave, and thus was effectively under arrest. Therefore, Overby's question, "Where is she?" amounted to custodial interrogation without *Miranda* warnings, and Appellant's incriminating answer should have been suppressed.

¶ 23 The district court concluded that under the "rescue doctrine," Overby's question was not tantamount to custodial interrogation. The rescue doctrine is a recognition that the exigencies of some situations—such as the imminent need to save human life—should forgive, or at least delay, strict compliance with *Miranda*. It is a natural and logical extension of the "public safety exception" to the *Miranda* rule, recognized by the United States Supreme Court in *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). We recently discussed, adopted, and applied the rescue doctrine in *Jackson v. State*, 2006 OK CR 45, ¶¶ 19–22, 146 P.3d 1149, 1157–59. In deciding whether an exchange between police and citizen falls under this doctrine, courts generally consider the apparent urgency of the situation, the potential for saving a person in danger, and the motivations of the officers involved. *See id.* at ¶ 21, 146 P.3d at 1158–59.

¶ 24 Appellant argues that the rescue doctrine should not apply in this case, and focuses on Overby's possible motivation for asking the question. Appellant supposes that, when Overby opened the tub and saw

a girl's shirt on top, he must have known that Jamie's lifeless body was beneath. We disagree. Jamie Bolin had disappeared without a trace; no one had any hint of her whereabouts or condition. Suddenly, Agent Overby was confronted with evidence that Appellant might have been involved in her disappearance. During an earlier discussion, Appellant had told Overby what Jamie was wearing on the day she disappeared, and went so far as to say that the media reports about what she was wearing were wrong. When Overby opened the container, he saw clothing matching the description Appellant had given. The urgency was dire; a young girl had been missing for two days. The exchange lasted but a few seconds. The very words Overby used ("Where is she?" rather than, say, "Is she in there?") are also telling. Under the circumstances, Overby's spontaneous and general query about Jamie's whereabouts was entirely reasonable, and was aimed at saving the girl's life—not calculated to build a case against Appellant. *Jackson*, 2006 OK CR 45, ¶ 22, 146 P.3d at 1159.[11] The trial court did not err in concluding that Appellant's initial confession to murder was admissible.[12]

#### d. Appellant's consent to search after invoking his right to counsel.

¶ 25 Appellant next challenges the officers' authority to continue searching his apartment after his arrest. It appears from the record that, from the time Appellant was arrested (around 5:30 p.m.) until a search warrant was obtained (around 10:30 p.m.), police limited their search of Appellant's apartment to briefly confirming his claim—

---

11. While *Quarles* permitted brief, uncounseled questions to detainees in the interests of general public safety, the threat in cases such as the one at bar is arguably even more compelling. "If on the facts before it, the *Quarles* court could conclude that the need for answers *to protect the public safety* outweighed the need for *Miranda* warnings, then surely, on the facts before us, it is reasonable to conclude that the need for answers *to protect the life of one person* outweighs the same need." *State v. Kunkel*, 137 Wis.2d 172, 404 N.W.2d 69, 76 (1987) (permitting questions to suspect about a missing child) (emphasis added).

12. Even assuming Overby's question was not permissible under the rescue doctrine, it was preceded by his lawful observation of highly suspicious evidence, and by Appellant's unsolicited, incriminating exclamation that he was worthy of arrest. We are convinced that, even before the question was asked, Overby had probable cause to search Appellant's apartment for additional evidence about Jamie's disappearance; and the fact that Appellant had murdered her, along with all of the physical evidence offered at trial, would have been discovered inevitably. *See Nix v. Williams*, 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984); *Pennington v. State*, 1995 OK CR 79, ¶ 42, 913 P.2d 1356, 1367.

that Jamie's body was inside the plastic tub. When police attempted to interview Appellant after he was taken into custody, he invoked his right to counsel. Questioning ceased, but a short time later, police asked him to reaffirm, in writing, his consent to the apartment search. He did, and it appears that the officers' brief re-entry into the apartment did not take place until after that written consent was relayed to them. The district court found the written consent to be invalid, given Appellant's invocation of his *Miranda* rights. Nevertheless, the court found no legal or factual reason to conclude that Appellant's prior, verbal consent to the search of his apartment was ever revoked.

¶ 26 Appellant posits that once a suspect has been taken into custody—or at least, by the time he invokes his rights to silence and counsel—any consent to search premises that he may have previously given is "exhausted." Appellant cites no authority for this position.[13] We believe this argument confuses rights guaranteed by the Fourth Amendment with those guaranteed by the Fifth Amendment and the *Miranda* rule. *See United States v. Mendez*, 431 F.3d 420, 427 (5th Cir.2005) (homeowner's consent to a search of his house was not automatically 'withdrawn' when police arrested him and read him his *Miranda* rights); *United States v. Mitchell*, 82 F.3d 146, 150–51 (7th Cir.1996) ("[T]he fact that Mr. Mitchell was placed under arrest sometime after the first consent does not work as an automatic withdrawal of the consent previously given"); *see also* Wayne R. LaFave, 4 *Search and Seizure* § 8.1(c) at 631 (4th ed.) ("[A] consent to search is not terminated merely by a worsening of the consenting party's position"). We agree with the trial court's ruling that Appellant never withdrew his original, verbal consent to a search of his apartment.

**e. Alleged faults in the search warrant affidavit.**

¶ 27 As noted, a full-scale search of Appellant's apartment was not undertaken

until several hours after his arrest, once police had obtained a search warrant. Appellant complains that the officers seeking the warrant did not inform the magistrate that he had declined to be questioned after his arrest, and that his written consent to search the apartment was executed after he invoked his *Miranda* rights. Appellant claims these omissions evince a reckless disregard for the truth, and should invalidate the warrant itself. *See Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) (evidence should be suppressed if obtained pursuant to a search warrant predicated on statements that were materially false, and which were made with knowledge of their falsity, or in reckless disregard for their truth).

¶ 28 When police seek the issuance of a search warrant, the magistrate's task is to determine, from the information presented, whether there is probable cause to believe that evidence of criminal activity is present at the place to be searched. 22 O.S.2001, §§ 1221–23. Appellant does not explain how his refusal to answer questions, or whether he had reaffirmed his prior consent to search, had any bearing on the probable-cause determination. *See Jones v. State*, 2006 OK CR 5, ¶¶ 26–27, 128 P.3d 521, 536–37 (validity of warrant to search home of defendant's parents, for evidence defendant was thought to have hidden there, was not affected by information, not presented to the magistrate, suggesting that the defendant was presently not at home). Two simple facts—Agent Overby's observation in Appellant's closet, and Appellant's simultaneous confession to murder—clearly supported the issuance of the search warrant.

¶ 29 In fact, the search of the apartment was independently justified through Appellant's verbal consent which, as explained above, was never withdrawn.[14] The fact

**13.** The only case Appellant refers us to is *United States v. Carey*, 172 F.3d 1268, 1274 (10th Cir. 1999). *Carey* deals with the reasonable limits inherent in a person's consent to search premises. The court held that the defendant's consent to search his home did not automatically authorize a search through files on his computer. We

find *Carey* inapposite to the issues presented here.

**14.** As Appellant observes, shortly after his arrest, officers did re-enter the apartment briefly to confirm that Bolin was deceased. As explained above, this re-entry may have occurred after Ap-

that police ultimately sought judicial approval for continuing the search is commendable, but ultimately unnecessary under these circumstances. *See Ball v. State,* 2007 OK CR 42, ¶¶ 46–48, 173 P.3d 81, 93 ("We will not pass upon what amounts to a hypothetical challenge to a search warrant that was unnecessary"). The trial court did not err in concluding that the search of Appellant's apartment was lawful.

**f. Appellant's recorded confession.**

¶ 30 Appellant contends that his incriminating statements to Agents Overby and Maag on the night of April 14, 2006 must be suppressed, because they were involuntarily made. In the interview, Appellant detailed how and why he murdered Jamie Bolin. A video recording of the interview, and a printed transcription for convenience, were presented to the jury in the guilt phase of Appellant's trial.

¶ 31 Once a suspect in custody has asserted his right to speak only through counsel, all attempts at interrogation must cease. *Miranda,* 384 U.S. at 473–74, 86 S.Ct. at 1627–28. A suspect can, however, change his mind, and decide to speak to police without counsel. If a suspect is interrogated after having invoked his *Miranda* rights, the burden rests on the State to demonstrate that the suspect's change of mind was a voluntary and intelligent choice. *Id.* at 475, 86 S.Ct. at 1628. A suspect's custodial statements are not voluntary if they are the product of coercion, including promises of leniency or other benefit. *Id.* at 476, 86 S.Ct. at 1629; *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964); *Myers v. State,* 2006 OK CR 12, ¶ 84, 133 P.3d 312, 333.

¶ 32 Appellant concedes that after his original invocation *of Miranda* rights, he reinitiated contact with police, but claims this action must be viewed in context. He points out that in the hours between invoking his right to silence and changing his mind, he conversed with several officers in a police lieutenant's office and made incriminating statements to them. He also points out that despite his initial request for a lawyer, none was provided to him during that time. Appellant notes that when Agent Overby asked him if he had been offered anything in exchange for his cooperation, Appellant commented that one officer had told him it would be "better" for him to cooperate. The identity of this officer was never determined; none of the many officers who testified at the suppression hearing admitted to making the statement, or knowing who did. The trial court concluded that under the totality of circumstances, Appellant's decision to talk to Overby and Maag was voluntary.

¶ 33 The trial court's conclusions are supported by the record. Whether a suspect's statements to police are voluntary in the legal sense depends on an evaluation of all the surrounding circumstances, including the characteristics of the accused and the details of the interrogation. *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). The ultimate inquiry is whether the confession is "the product of an essentially free and unconstrained choice by its maker." *Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961). At the suppression hearing, OSBI Agent Lydia Williams testified that while officers were preparing an affidavit for search warrant, word was received that Appellant wanted to talk. Williams went to the room where Appellant was being held and asked him to clarify his desires, explaining that because he had previously asked for a lawyer, they were not allowed to talk to him anymore. According to Williams, Appellant replied emphatically, "But I want to talk," and indicated his preference to speak to Agents Overby and Maag, who had accompanied him to his apartment earlier that day. This unrefuted evidence shows that Appellant voluntarily reinitiated contact with police on the subject of his detention—the murder of Jamie Bolin. *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101

pellant was asked to reaffirm his consent to search in writing (and after he had invoked his right to silence), but it was equally justified on Appellant's previous and unrevoked verbal consent to search. The magistrate was aware of the officers' re-entry, but it does not change the result here.

S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981); *Ullery v. State*, 1999 OK CR 36, ¶¶ 16–21, 988 P.2d 332, 343–44.[15]

██ ¶ 34 The video recording of the ensuing interview is of great benefit in determining the voluntariness of Appellant's decision. It, too, supports the trial court's conclusions. While Appellant notes during the interview that someone had commented it might be better for him to cooperate, the tone of his voice does not suggest he interpreted the comment as any type of promise. Mere exhortations to cooperate and tell the truth, not accompanied by any threat or promise, do not render a confession involuntary. *Young v. State*, 1983 OK CR 126, ¶ 15, 670 P.2d 591, 595; *United States v. Chalan*, 812 F.2d 1302, 1307 (10th Cir.1987); *United States v. Bailey*, 979 F.Supp. 1315, 1318 (D.Kan.1997). Throughout the interview, Appellant appears calm, even eager to talk about the details of the crime. The agents are friendly but ask few questions; Appellant does the vast majority of the talking. After about an hour of details, Appellant suddenly becomes too nauseated to continue. The agents seek medical attention for him, and the interview is concluded. Given the unrefuted testimony at the suppression hearing, and the particular circumstances of the interview itself, the trial court did not err in concluding that Appellant's interview with Agents Overby and Maag was voluntary. *McHam v. State*, 2005 OK CR 28, ¶ 31, 126 P.3d 662, 672; *Wisdom v. State*, 1996 OK CR 22, ¶ 26, 918 P.2d 384, 392.

¶ 35 In summary, the trial court conducted an extensive hearing on the admissibility of physical evidence and incriminating statements made by Appellant. The trial court made detailed findings of fact, and properly applied the applicable law. We find no error in the trial court's analysis regarding the admissibility of Appellant's incriminating statements and evidence seized from his apartment. Proposition 1 is denied.

15. Appellant likens his situation to that in *State v. Pope*, 2009 OK CR 9, 204 P.3d 1285. In *Pope*, we held that a trial court did not err in suppressing a defendant's confession. The facts in *Pope* are markedly different from those here. In *Pope*, when the defendant invoked her *Miranda* rights and declined to be interrogated, the detective continued to badger her about why an "innocent person" would want a lawyer. When the defendant repeatedly maintained that she did not want to talk without a lawyer present, the detective placed her under arrest and left the room. In less than an hour, the defendant asked someone to summon the detective, and began writing out a confession. When the detective returned, he let the defendant complete her written confession before reminding her that she had requested an attorney and asking if she had changed her mind. When the defendant said she had, the interview resumed. We agreed with the district court's findings that the totality of circumstances—the continued badgering of the defendant after her request for counsel, the isolation of the defendant, her physical and mental character, and the State's failure to remind her of her *Miranda* rights before receiving her confessions (written and verbal), rendered the statements involuntary in the legal sense. In this case, there is no evidence of badgering; Appellant was not held *incommunicado* (indeed, one of the guarding officers called Appellant's parents for him, at Appellant's request); and when Appellant sought an audience with Agents Overby and Maag, he was explicitly reminded of his previous invocation of *Miranda* rights, and he reviewed those rights again, word for word, before the interview began.

Appellant also likens his case to *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), which condemned the practice of "pre-interviewing" detainees without first advising them of their *Miranda* rights, and explaining those rights only *after* incriminating evidence had been obtained, in the apparent hope that the suspect, having already confessed, would be more likely to just keep talking. *See id.* at 613, 124 S.Ct. at 2611 ("Upon hearing [*Miranda*] warnings *only in the aftermath of interrogation and just after making a confession*, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again" (emphasis added)). The sequence of events is quite different here. Appellant claims he was "pre-interviewed" without the benefit of *Miranda* warnings, when various officers chatted with him as they stood guard over him in the hours between his arrest and his request to speak with Agents Overby and Maag. What Appellant fails to acknowledge, however, is that he was advised of his *Miranda* rights on the very first interview attempt after his arrest, and that he understood the warning well enough to refuse further questioning at that time. *Seibert* did not seek to supplant the jurisprudence of *Miranda* and *Edwards v. Arizona*, which clearly contemplate that a suspect in custody, having invoked his right to silence, may thereafter change his mind.

## II. JURY SELECTION ISSUES

¶ 36 In Proposition 2, Appellant claims that the trial court erred in refusing to excuse three prospective jurors for cause, and that he was forced to use peremptory challenges (provided by state law to be used at the party's discretion) to cure these mistakes. Appellant timely challenged the ability of each of the three panelists to be impartial, and renewed his challenges at the conclusion of *voir dire*. After using peremptory challenges to remove these panelists, he identified three other panelists, explained why they too were unacceptable to him, and asked for additional peremptory challenges to remove them as well. The trial court denied this request. Appellant's complaint has thus been preserved for appellate review.[16] *Grant v. State*, 2009 OK CR 11, ¶ 18, 205 P.3d 1, 11.

■■■■ ¶ 37 A defendant is entitled to be tried by jurors who can approach the facts of the case impartially, and who can decide the issues before them based on the evidence presented to them in court. *Irvin v. Dowd*, 366 U.S. 717, 721–23, 81 S.Ct. 1639, 1642–43, 6 L.Ed.2d 751 (1961). Additionally, a defendant charged with a capital crime is entitled to jurors who can give fair consideration to all available punishments. *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); *Eizember v. State*, 2007 OK CR 29, ¶ 42, 164 P.3d 208, 222. The selection of jurors involves many subtle observations, and trial courts have broad discretion when considering a request to excuse a juror for cause. *Witt*, 469 U.S. at 425, 105 S.Ct. at 853. When reviewing such claims, we consider the entire record of the panelist's *voir dire*, not just isolated answers. *Ro-*

*jem v. State*, 2009 OK CR 15, ¶ 3, 207 P.3d 385, 388.

■■■■ ¶ 38 The first panelist Appellant complains about is Panelist S. Appellant claims that S. could not fairly consider any penalty other than death. We disagree. The trial court permitted juror questionnaires prior to trial; counsel possessed important information about each prospective juror before *voir dire* proceedings began. Even more importantly, the court permitted individual "death-qualification" *voir dire*, to determine which panelists could give fair consideration to all punishment options. During that process, each panelist was able to speak to the court and counsel with as much candor as possible.[17]

¶ 39 Appellant contends that Panelist S. was unqualified to sit, because she had "preconceived notions about death being the appropriate punishment for an intentional murder." The colloquy with Panelist S. comprises about twenty pages of transcript. Appellant cites isolated answers from the exchange which tend to show S.'s initial predilection for the death penalty in cases of intentional homicide. However, Appellant concedes that when S. was reminded that any decision on punishment would be guided by the court's legal instructions, she was confident that she could follow those rules, even if it resulted in a sentence other than death.[18]

■■■■ ¶ 40 To be qualified to sit on a capital jury, a panelist must be unequivocal in her willingness to fairly consider all punishment options, as the law requires. But just as a defendant is not entitled to jurors who are completely ignorant of the circumstances surrounding the crime, *see Plantz v.*

---

16. Appellant does not claim that any of the three "unacceptable" jurors were removable for cause. In fact defense counsel conceded at trial that they were not.

17. We also note that when counsel re-argued the for-cause challenges, on the fifth day of jury selection, neither counsel nor the court had to rely on memory alone concerning what the panelists said. Transcriptions of previous *voir dire* sessions had already been prepared.

18. For example, when defense counsel asked S. if she understood that the law required her to

fully and fairly consider all punishment options, she replied:

> I understand that. That's why I'm saying at this point, that's why I asked is there a set— because I am not into law and all of the things of law. But I am a scientist by—that's my job. And so I understand the rules. You know, A leads to B leads to C. And so if I have a set of rules, I can play within the rules. If I am told this must happen for this to happen, this must happen for this, then I don't have a problem staying inside my boundary, if that's what. . . .

*State,* 1994 OK CR 33, ¶ 18, 876 P.2d 268, 275, so too, the law does not require jurors in a capital case to come to the process with complete indifference about the death penalty. It is inconceivable that citizens called for jury duty could come to court without some general opinions about capital punishment. And it is unfair to fault such panelists for giving honest answers when asked to provide factors that might warrant that penalty.[19] Panelist S. maintained that she could follow the law on punishment, even in a case involving the intentional murder of a young girl. She stated that she would weigh a defendant's history, past conduct, and other factors in deciding the appropriate sentence. The trial court did not abuse its discretion in refusing to remove Panelist S. for cause. *Harris v. State,* 2004 OK CR 1, ¶ 18, 84 P.3d 731, 742.

■■■ ¶ 41 Appellant next claims that Panelist B. should have been removed for cause, because of her feelings about the death penalty, and because B.'s own mother had been the victim of an intentional homicide over forty years earlier. When asked how her mother's death would affect her as a juror in this murder trial, B. succinctly responded: "I don't really think one has anything to do with the other." Several times, when pressed about any predispositions she might have, B. qualified her answers with statements like, "I don't know the facts yet." She believed the death penalty was appropri-

ate under certain circumstances, but in answer to defense counsel's hypothetical, she did not believe it was necessarily the only appropriate sentence for the intentional murder of a young girl. Panelist B. assured defense counsel that she could consider all punishment options, and agreed that mitigating evidence could make a difference in her decision. The trial court did not abuse its discretion in refusing to remove Panelist B. for cause.[20] *Harris,* 2004 OK CR 1, ¶ 16, 84 P.3d at 742.

¶ 42 Finally, Appellant claims Panelist T. should have been removed for cause for actual bias. During individual *voir dire,* T. admitted that when he first heard about the murder of Jamie Bolin, his gut reaction was that he would "like to get his hands on" the person who committed it. Panelist T. had two children about the same age as the victim, and he said that he became more protective of them after hearing about this crime.

■■■ ¶ 43 Appellant's complaint centers not on T.'s feelings about the death penalty in general, but on T.'s alleged "bias" against the perpetrator of this crime, particularly on the issue of punishment.[21] We do not read T.'s initial reaction to news about the murder as having anything to do with the death penalty. He did not proclaim that whoever committed the crime should automatically be put to death. Rather, T.'s admission—that his gut reaction was a desire to "get his hands on" the perpetrator—seems to us a

19. Panelist S. was very frank about her feelings on punishment. She was also frank about being confused by the way in which questions were posed to her, depending on which party was posing the questions ("Why does it sound different when you ask me, and then you ask me?"). At one point, defense counsel asked S., "When it comes to thought, particularly thoughts of an adult male who has killed intentionally a 10-year-old child, your thoughts are death, am I correct?" S. answered:

> Yes, my thoughts are, but not necessarily my conviction. Does that make sense? ... And I don't know why I feel different when you ask me that and when you ask me that. I can't explain that, because I don't have a problem considering all three equally and fairly.

Then, at defense counsel's request and over the State's objection, S. listed several specific factors that could convince her not to impose the death penalty.

20. In fact, defense counsel's concerns about Panelist B. appear to be in spite of her answers, not because of them. Counsel's only specific objection to B. at the time of *voir dire* involved the murder of her mother, and whether she was being "realistic" in assuring the parties that that event had no bearing on her ability to follow the law in this case. Appellant now observes that B. did not relate any details surrounding her mother's death. Defense counsel, who was aware of the event from B.'s questionnaire, had a perfect opportunity to explore this subject during individual *voir dire,* but chose not to.

21. *See* 22 O.S.2001, § 659 (defining "actual bias," with reference to juror disqualification, as "the existence of a state of mind on the part of the juror, in reference to the case, or to either party, which satisfies the court, in the exercise of a sound discretion, that he cannot try the issue impartially, without prejudice to the substantial rights of the party challenging").

frank (and not unnatural) first response to what defense counsel himself repeatedly described in *voir dire* as a "horrific" crime. Indeed, it is difficult to imagine any person being literally "indifferent" to the basic facts of this case. Initial reactions aside, T. assured the court and counsel that he could fairly consider all available punishments in the context of the criminal trial. The trial court did not abuse its discretion in refusing to excuse Panelist T. for cause. *Browning v. State*, 2006 OK CR 8, ¶ 12, 134 P.3d 816, 829–830.

¶ 44 In summary, Appellant identified three panelists that he believed were removable for cause based on their feelings about the death penalty. We have examined the record on all three, and conclude that the trial court did not abuse its discretion in refusing to remove any of them. The fact that Appellant chose to use some of his peremptory challenges to remove these three panelists did not violate any constitutional or statutory right *Harris*, 2004 OK CR 1, ¶ 18, 84 P.3d at 742. Proposition 2 is denied.

## III. ADMISSIBILITY OF CERTAIN PHYSICAL EVIDENCE

¶ 45 In Proposition 3, Appellant claims he was denied a fair trial by the introduction of irrelevant and highly inflammatory evidence, specifically, (1) an excessive number of postmortem photographs of the victim; (2) a single premortem photograph of the victim; and (3) various items of physical evidence seized from Appellant's apartment. Appellant objected to all of this evidence, filing a general motion *in limine* and timely making objections when the evidence was actually offered. We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Pavatt v. State*, 2007 OK CR 19, ¶ 42, 159 P.3d 272, 286.

### a. Postmortem photographs of the victim.

¶ 46 Prior to the testimony of the Medical Examiner, the State offered into evidence several photographs of Jamie Bolin's body. The trial court was keenly aware of the shocking nature of the photographs, but it was not required to exclude them on that basis alone. The court carefully considered the photographs in *in camera* hearings, and questioned the State as to the relevance or necessity of many of them. The State withdrew some photographs, and the court excluded others. Certain photographs were admitted as court exhibits only, to aid the Medical Examiner in her testimony, but were not to be displayed to the jury. Due to the gruesome nature of the photographs, the court determined that those which would be published to the jury would not be displayed on the video monitor which had been used for other exhibits.

¶ 47 In the end, the court admitted fewer than a half-dozen photographs of Jamie's body, depicting the condition in which it was initially discovered, the neck wound, and the fingernail marks on her face, which corroborated Appellant's claim as to how he killed the girl. The State was not obligated to downplay the shocking nature of the crime. *Warner v. State*, 2006 OK CR 40, ¶ 168, 144 P.3d 838, 887. Evidence is not objectionable simply because it is prejudicial, but only if it is substantially and unfairly so. 12 O.S.Supp.2003, § 2403. The photographs were indeed gruesome, but they accurately depicted the injuries that Appellant admitted to inflicting on his victim. *Grant*, 2009 OK CR 11, ¶¶ 49–50, 205 P.3d at 21. They were not needlessly cumulative to one another, and the trial court did not abuse its discretion in admitting them.

### b. Premortem photograph of the victim.

¶ 48 Over Appellant's objection, the trial court admitted a single school portrait of Jamie Bolin during the guilt phase of the trial. Appellant claims, as he did at trial, that this photograph was not relevant to any material issue, and that because all guilt-stage evidence was incorporated into the sentencing stage, it injected passion and prejudice into the jury's verdict on punishment. We have rejected similar claims in the past. The Evidence Code permits the introduction of an "appropriate" photograph of a homicide victim, "to show the general appearance and condition of the victim while alive." 12 O.S.Supp.2003, § 2403. As we have repeatedly held, because this provision requires

the photograph to be "appropriate" to its purpose, the trial court must still consider whether any proffered photograph is so unfairly prejudicial that it should be excluded. *See Grant,* 2009 OK CR 11, ¶ 52, 205 P.3d at 22; *Marquez–Burrola v. State,* 2007 OK CR 14, ¶¶ 28–33, 157 P.3d 749, 759–761; *Coddington v. State,* 2006 OK CR 34, ¶¶ 53–58, 142 P.3d 437, 452–53. The trial court did not abuse its discretion in admitting this single photograph in the guilt stage of trial; and considering the totality of evidence offered at sentencing, we cannot say its admission denied Appellant a fair sentencing proceeding. *Coddington,* 2006 OK CR 34, ¶¶ 57–58, 142 P.3d at 453.

**c. Items seized from Appellant's apartment.**

 ¶ 49 Appellant also complains that various items of evidence seized from his apartment were irrelevant to the issues in the case and should not have been admitted. Most of these items were weapons, tools, pornography, or other items of a sexual and/or violent nature. Conceding that a knife was used to cut Jamie's throat, Appellant claims that admission of other sharp weapons found in his apartment was unnecessary. He claims the jury did not need to see the clothing that the girl wore on the day he murdered her, or the plastic sheet and blood-soaked towel that he wrapped her body in. Appellant also complains that materials of a sexual or violent nature found in his apartment (*e.g.* sex toys, handcuffs, pornographic videos, and various perverse images printed from the Internet) only served to humiliate him in front of the jury. Appellant objected to many of these items, but not to all of them. He claims much of this evidence (such as a jar of meat tenderizer) was inadmissible because it illustrated only things he "may have thought of, but never did."

¶ 50 We disagree. These items were relevant to Appellant's motive and intent. They corroborated his detailed confession about his plan to subdue his victim, sexually violate her, and perform other gruesome acts upon her body, and about how this plan had evolved in his mind over the preceding months. *See Warner,* 2006 OK CR 40, ¶ 68,

144 P.3d at 868 (sexually-explicit video and lubricants were properly admitted to show what the defendant was watching and thinking about prior to the rape and murder of infant girl); *see also Slaughter v. State,* 1997 OK CR 78, ¶¶ 22–27, 950 P.2d 839, 849–850 (various pieces of evidence tending to show defendant's interest in the occult, and unexpected comments about killing and mutilation, were properly admitted, as they tended to show the defendant's state of mind and how he might have been capable of murdering an infant and mutilating her mother's body). Many of these items were specifically mentioned by Appellant when he spoke with the police, and because they corroborated his expressed intentions, they bore on the veracity of the confession. As with the photographs of the victim's body, the trial court carefully considered each article offered into evidence, excluded some, and placed restrictions on the display of others. The trial court did not abuse its discretion in admitting any of these items. *Jackson,* 2006 OK CR 45, ¶ 56, 146 P.3d at 1156.

¶ 51 Furthermore, we fail to see how Appellant was harmed by the admission of this evidence. He claims that offering these items into evidence was overkill, because it was "obvious," from his confession and the testimony of his own experts, that he is a "sexually and mentally disturbed individual." And indeed, Appellant's many bizarre, violent, and gruesome sexual obsessions were discussed in detail, both in his statements to police (presented in the guilt stage), and in the extensive testimony of his own mitigation experts (presented in the punishment stage). Yet, these same facts convince us that the introduction of corroborating physical evidence did not unfairly contribute either to the finding of guilt or the assessment of punishment in this case. The evidence of Appellant's guilt was overwhelming and essentially uncontested; and while his sexual obsessions arguably showed he was a continuing threat to society, the jury rejected that aggravating circumstance before imposing the death sentence. *See Mitchell v. State,* 2010 OK CR 14, ¶ 55, 235 P.3d 640, 654–55 (admission of defendant's prior testimony was harmless, as jury rejected the aggravating circumstance the statements

were offered to prove). There is no error here. Proposition 3 is denied.

## IV. PUNISHMENT–STAGE INSTRUCTIONS

¶ 52 In Proposition 4, Appellant complains that the trial court's punishment-stage instructions did not allow the jury to fully consider all of the evidence he presented in mitigation of sentence. Appellant objected to these instructions and proposed one of his own, which he believed would broaden the definition of mitigating circumstances to more clearly include the kinds of evidence he had presented in the punishment stage. The trial court rejected the instruction proffered by the defense, preserving this issue for review.

¶ 53 The trial court gave the Uniform Jury Instruction, OUJI–CR (2nd) No. 4–78, which defined mitigating circumstances as those which, "in fairness, sympathy, and mercy, may extenuate or reduce the degree of moral culpability or blame." Appellant argues that his mitigation evidence was intended to show he was deserving of a sentence less than death, *despite* his "moral culpability or blame" for the murder of Jamie Bolin. He claims that under the court's definition, his mitigation strategy was essentially worthless because none of the evidence he presented did, in fact, reduce his moral culpability or blame, and he claims that the prosecutors' closing arguments invited the jury to reach the same conclusion.

¶ 54 We have rejected similar attacks on OUJI–CR (2nd) No. 4–78 many times in the past. *See e.g. Glossip v. State,* 2007 OK CR 12, ¶¶ 119–120, 157 P.3d 143, 161–62; *Rojem v. State,* 2006 OK CR 7, ¶¶ 57–58, 130 P.3d

287, 299; *Primeaux v. State,* 2004 OK CR 16, ¶¶ 90–96, 88 P.3d 893, 909–910; *Fitzgerald v. State,* 2002 OK CR 31, ¶ 17, 61 P.3d 901, 906; *Williams v. State,* 2001 OK CR 9, ¶ 109, 22 P.3d 702, 727–28. However, as Appellant points out, several months before his trial, in *Harris v. State,* 2007 OK CR 28, 164 P.3d 1103, we recommended changes in the wording of this instruction. Nevertheless, in *Harris* we reiterated that the instruction, as it had existed for many years, was not "legally inaccurate, inadequate, or unconstitutional," and that "cases in which the current OUJI–CR (2nd) No. 4–78 has been used and applied are not subject to reversal on this basis." *Id.* at ¶ 26, 164 P.3d at 1114.[22]

¶ 55 Like Appellant, the defendant in *Harris* complained that the prosecutors had exacerbated the perceived faults in the instruction, by arguing that the defendant's second-stage evidence should be completely disregarded as it did not meet the definition of "mitigating evidence" given by the court. Considering the arguments as a whole, we found no error. Similarly, we find no cause for relief here. During the State's first closing argument in the punishment stage, the prosecutor told the jurors that *they* were to decide what qualified as mitigating evidence, and that they could consider factors besides those advanced by the defense.[23] Similar comments were made in the State's final closing. As we wrote in *Grant v. State,* 2009 OK CR 11, ¶ 48, 205 P.3d at 21:

Appellant claims the prosecutor misstated the law by telling the jurors that the evidence he had presented as "mitigating" did nothing to justify a sentence less than death. Appellant confuses what kind of

---

**22.** Before the revision recommended in *Harris,* the instruction read, in relevant part, as follows:

Mitigating circumstances are those which, in fairness, sympathy, and mercy, may extenuate or reduce the degree of moral culpability or blame. The determination of what circumstances are mitigating is for you to resolve under the facts and circumstances of this case.

The revised instruction reads, in relevant part, as follows:

Mitigating circumstances are (1) circumstances that may extenuate or reduce the degree of moral culpability or blame, or (2) circumstances which in fairness, sympathy or mercy may lead you as jurors individually or

collectively to decide against imposing the death penalty. The determination of what circumstances are mitigating is for you to resolve under the facts and circumstances of this case.

The revised instruction was not promulgated by the OUJI Commission until a few weeks after Appellant's trial.

**23.** "[L]ook at all those mitigators, and you decide what that means. . . . I submit to you that our aggravators that we have alleged in this case absolutely, absolutely outweigh any of the mitigators. And you can think of other mitigators if you want besides what's on the list."

information may be offered as mitigating evidence, with whether that information successfully serves its intended purpose. While there is no restriction whatsoever on what information might be considered mitigating, no juror is bound to accept it as such, and the State is free to try to persuade the jury to that end. The prosecutor's arguments did not misstate the law on this point.

¶ 56 Neither the trial court's instructions, nor the prosecutor's argument, implied that the jury should ignore any of the evidence offered by Appellant in mitigation of sentence. The prosecutors merely argued that this evidence did not warrant a sentence less than death. The trial court did not err in rejecting the alternative instruction offered by Appellant. Proposition 4 is denied.

## V. STATE EXPERT TESTIMONY

¶ 57 In Proposition 5, Appellant claims he was denied a fair sentencing proceeding by certain comments of the State's mental health expert. In the punishment stage, the defense presented extensive expert testimony about Appellant's mental health, based to a significant degree on in-person psychological evaluations. In response, the State presented the testimony of Dr. Reid Meloy, who never personally interviewed Appellant, but who was retained only to critique the methods used and conclusions drawn by the defense experts. Appellant claims that Dr. Meloy insinuated he had been blocked from interviewing Appellant personally, and Appellant likens this to an improper comment on a defendant's right to remain silent. *See e.g. Doyle v. Ohio,* 426 U.S. 610, 618–19, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976). The analogy simply does not fit here.

¶ 58 Interestingly, Appellant does not claim that the *prosecutor* deliberately sought to insinuate that Dr. Meloy was not allowed to interview him, but rather, that the witness improperly made the implication on his own. Both theories, however, are belied by the

record. Dr. Meloy made it clear, early in his direct examination, that he was not hired by the State to personally evaluate Appellant, but only to review the evaluations of the defense experts. In fact, he agreed with much, if not most, of the defense experts' findings. He stated that he had no reason to disagree with their diagnoses about Appellant's disorders. On re-direct examination, when the prosecutor asked Meloy if he would have liked to have visited with Appellant himself, defense counsel objected, believing that the prosecutor was headed toward an improper comment. The trial court sustained the objection, and the prosecutor (while denying any improper intentions) clearly abided by the court's ruling, rephrasing the question thus:

> So you would have actually liked to have talked to those people who reported—*not talking about the defendant,* but those other people who made these reportings of his life history, you'd actually like to talk to them yourself, if you were going to make that diagnosis?

(Emphasis added.) Dr. Meloy's reply is the crux of Appellant's complaint:

> Well, yes, *if my role was different in the case. If I'd been asked* to be an evaluator, I would have wanted to interview Mr. Underwood, to test him, to review any evidence in the case—

(Emphasis added.) When defense counsel objected again, the court sustained it, and again the prosecutor kept the focus off of Appellant:

> I'm sorry. We're not talking about the defendant. We're talking about the friends and family that he was around growing up.

To which Meloy replied, "If that was my role in the case, yes."[24]

¶ 59 The limitations on Dr. Meloy's role in the case were made clear to the jury. They were made clear again in cross-examination

---

**24.** The defense experts had based their testimony, in part, on anecdotal information about Appellant's family and childhood, attributed to friends and family members. On cross-examination, the prosecutors had attacked the credibility of the defense experts by pointing out that they had not personally interviewed many of their sources, and noting that while some of Appellant's friends and family had testified in the punishment stage, the picture they had painted was not as grim as the defense attorneys had promised.

by defense counsel. Dr. Meloy did not interview Appellant because he was never asked to do so by the State. Appellant was not unfairly prejudiced by this testimony. Proposition 5 is denied.

## VI. CONSTITUTIONALITY OF CAPITAL SENTENCING PROCEDURE

¶ 60 In Proposition 6, Appellant complains that Oklahoma's capital-sentencing scheme is unconstitutional in how it instructs juries to consider aggravating and mitigating circumstances, and in the fact that it does not instruct the jury on a presumption that a life sentence is the appropriate punishment. Appellant raised these issues prior to trial, and renewed his concerns in the punishment stage, thus preserving them for review. *Wilkins v. State*, 1999 OK CR 27, ¶ 5, 985 P.2d 184, 185.

¶ 61 Appellant concedes that before his jury could even consider the death sentence, it had to unanimously find the existence of at least one alleged aggravating circumstance by proof beyond a reasonable doubt. He admits that before his jury could consider a death sentence, it also had to find that the aggravating circumstance(s) unanimously found to exist outweighed any mitigating circumstances. And he does not deny his jury was properly instructed that, despite such an analysis, it was never *required* to impose a death sentence. Rather, Appellant's complaint is that his jury was not instructed that, when weighing aggravating and mitigating circumstances, it could not consider a death sentence unless the aggravating circumstances outweighed any mitigating circumstances "beyond a reasonable doubt." As support for this claim, Appellant relies on the United States Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), which held that any fact rendering a defendant eligible for the death penalty—much like any fact necessary to support a conviction for the

predicate crime—must be established by proof beyond a reasonable doubt.

¶ 62 Appellant acknowledges that we have considered this issue many times and consistently rejected it, before and after *Ring*. *See e.g. Torres v. State*, 2002 OK CR 35, ¶¶ 6–7, 58 P.3d 214, 216; *Romano v. State*, 1993 OK CR 8, ¶¶ 111–12, 847 P.2d 368, 392. The jury's consideration of aggravators *versus* mitigators is a balancing process which is not amenable to the "beyond a reasonable doubt" standard of proof. *Id.* at ¶ 112, 847 P.2d at 392. As the Tenth Circuit has noted, it is a "highly subjective" and "largely moral" judgment about the punishment that a particular person deserves.[25] *United States v. Barrett*, 496 F.3d 1079, 1107 (10th Cir.2007) (rejecting similar claim) (citing *Caldwell v. Mississippi*, 472 U.S. 320, 340 n. 7, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985)); *see also Matthews v. Workman*, 577 F.3d 1175, 1195 (10th Cir. 2009) (rejecting similar claim). We are not persuaded to revisit this issue.

¶ 63 As for his claim that the jury should have been instructed on a "presumption" of a life sentence, Appellant concedes that we have consistently rejected this notion as well. *See e.g. Warner*, 2006 OK CR 40, ¶ 142, 144 P.3d at 882 (citing cases). The instructions given by the trial court appropriately explained the prerequisites to finding Appellant eligible for a death sentence. Proposition 6 is denied.

## VII. SUFFICIENCY OF EVIDENCE TO SUPPORT DEATH SENTENCE

¶ 64 In Proposition 7, Appellant claims the evidence presented at his trial was insufficient, as a matter of law, to support the single aggravating circumstance found by the jury: that the murder of Jamie Bolin was especially heinous, atrocious, or cruel. To prove this aggravating circumstance, the State must show that the victim's death was preceded by torture or serious physical

---

25. The unique, subjective nature of this particular aspect of capital sentencing is evidenced by the fact that, while jurors must unanimously agree on any aggravating circumstances that make the death penalty possible (again, by proof beyond a reasonable doubt), there need be no unanimity on the existence of, or weight assigned to, any mitigating factors. Each juror, individually and privately, weighs the unanimously-agreed-upon aggravators against whatever circumstances they believe might warrant a sentence less than death. *See* OUJI–CR (2nd) No. 4–78.

abuse. *DeRosa v. State*, 2004 OK CR 19, ¶ 96, 89 P.3d 1124, 1156. "Serious physical abuse" requires evidence that the victim experienced conscious physical suffering prior to death. *Warner*, 2006 OK CR 40, ¶ 129, 144 P.3d at 880; OUJI–CR (2nd) No. 4–73. The crucial aspect of this aggravator is the victim's awareness. Physical acts done to the victim, no matter how vile, will not establish the "heinous, atrocious, or cruel" aggravator if no rational juror could find, beyond a reasonable doubt, that the victim was conscious of them. Nevertheless, so long as the evidence supports a finding that death was preceded by torture or serious physical abuse, the jury is permitted to consider all the circumstances of the case, including "the attitude of the killer and the pitiless nature of the crime." *Lott v. State*, 2004 OK CR 27, ¶ 172, 98 P.3d 318, 358.

¶ 65 The fact that Jamie Bolin consciously suffered for an appreciable length of time before her death was firmly established by Appellant's confession, which was in turn corroborated by the medical evidence. Appellant told police that he hit Jamie on the back of her head several times with a cutting board, and that he hit her so hard that he was surprised the board did not break. Despite Jamie's pleas, Appellant proceeded to suffocate her with his bare hands. Appellant reported that more than once, Jamie's body went limp, but then she would come around and resume the struggle for life. Appellant told police it took some fifteen to twenty minutes before Jamie finally succumbed. The Medical Examiner observed trauma to the back of Jamie's head consistent with Appellant's statements. Scratches, consistent with fingernails being pressed into the skin, were observed on her face. The Medical Examiner concluded that the cause of Jamie's death was asphyxiation. Appellant did not contest this conclusion at trial.

¶ 66 In fact, Appellant does not deny that Jamie experienced conscious physical suffering before her death. Rather, he argues that the length of time it took to kill her was an "unintended circumstance," as he had planned to end her life quickly and quietly, but things just did not work out that way. Actually, Appellant's original plan (according to what he told police) was to tape his victim's mouth so she could not scream, make her watch pornographic movies, rape her, torture her in various despicable ways, and then, while she was "still alive and gagged" (and presumably conscious), decapitate her. This plan can scarcely be called merciful. In any event, a defendant will not be heard to excuse any "serious physical abuse" on his own poor planning; a murder is not mitigated by the fact that the victim put up a fight to save her own life. *See Le v. State*, 1997 OK CR 55, ¶ 36, 947 P.2d 535, 550.[26] Jamie's resistance might have come as a surprise to Appellant, but sadly, it did not dissuade him from his murderous goal, no matter how much the child pleaded and struggled.

¶ 67 Appellant also claims that the jury's finding on this aggravating circumstance was improperly influenced by evidence of the gruesome things he planned to do but didn't, and things he did to Jamie's body after her death. Yet, as mentioned, Appellant concedes that the evidence establishes conscious physical suffering before death. So long as the evidence supports that finding, the jury's consideration of all the circumstances of the case is not grounds for relief. *See Lott*, 2004 OK CR 27, ¶ 172, 98 P.3d at 358. The evidence Appellant complains of as unfairly distracting was, in fact, properly admitted. The evidence was sufficient to support the jury's verdict that Jamie Bolin's murder was especially heinous, atrocious, or cruel.[27] Proposition 7 is denied.

---

26. "Le also claims this circumstance should not apply because he did not intend to torture Nguyen or inflict gratuitous pain. He argues that he merely intended to knock Nguyen out and rob him and things got out of hand.... Le mistakes this Court's finding of sufficient evidence in individual cases for requirements of proof. Evidence of a killer's intent to inflict torture or pitiless attitude may in some cases support the jury's finding of this aggravating circumstance, but that evidence is certainly not required in every case." *Le*, 1997 OK CR 55, ¶ 36, 947 P.2d at 550.

27. *See Lott*, 2004 OK CR 27, ¶ 173, 98 P.3d at 358 ("heinous, atrocious, or cruel" aggravator supported by evidence that the victim was suffocated, and put up resistance before capitulating); *Marshall v. State*, 1998 OK CR 30, ¶ 29, 963 P.2d 1, 10 ("heinous, atrocious, or cruel" aggravator supported by evidence that the victim struggled

## VIII. CONSTITUTIONALITY OF "HEINOUS, ATROCIOUS, OR CRUEL" AGGRAVATING CIRCUMSTANCE

▉ ¶ 68 In Proposition 8, Appellant claims that Oklahoma's "heinous, atrocious, or cruel" aggravating circumstance is unconstitutionally vague and overbroad. Appellant preserved this issue for review by a general objection before trial, and by submitting his own proposed instruction, which was denied. On numerous occasions, we have rejected similar attacks on the current formulation of this aggravator, and the Uniform Jury Instructions that explain it. *See e.g. Wood v. State*, 2007 OK CR 17, ¶ 20, 158 P.3d 467, 475; *Browning*, 2006 OK CR 8, ¶ 52, 134 P.3d at 843–44. We decline to revisit the issue here.[28] Proposition 8 is denied.

## IX. CONSTITUTIONALITY OF EXECUTING THE MENTALLY ILL

▉ ¶ 69 In Proposition 9, Appellant contends that his death sentence should be vacated because the execution of the mentally ill violates the ban on cruel and unusual punishments, found in the Eighth Amendment to the United States Constitution. He contends that he was mentally ill at the time he murdered Jamie Bolin, and points out that all of the experts who examined him agreed that he suffers from one or more mental problems. However, at trial Appellant did not raise an insanity defense, or otherwise argue that he suffered a diminished capacity to understand the nature of his conduct at the time of the crime. Rather, Appellant presented evidence of mental illness as a circumstance in mitigation of sentence. Apparently, the jury concluded that whatever mental illness Appellant might have, the death penalty was still the most appropriate sanction for his conduct. While the Eighth Amendment prohibits execution of a defendant whose mental illness "prevents him from comprehending the reasons for the penalty or its implications," *Ford v. Wainwright,*

477 U.S. 399, 417, 106 S.Ct. 2595, 2606, 91 L.Ed.2d 335 (1986), there is no evidence that Appellant falls into that category. Despite evidence that Appellant suffers from some sort of mental illness, we accept the jury's conclusion that he was morally culpable for his actions and deserving of the death penalty. *See Grant,* 2009 OK CR 11, ¶¶ 59–61, 205 P.3d at 23–24; *Lockett v. State,* 2002 OK CR 30, ¶ 42, 53 P.3d 418, 431. Proposition 9 is denied.

## X. VICTIM–IMPACT TESTIMONY

▉ ¶ 70 In Proposition 10, Appellant complains that improper victim-impact evidence denied him a fair sentencing proceeding. Appellant's only complaint on this subject is that the two victim-impact witnesses— Jamie Bolin's mother and father-were allowed to recommend, without amplification, that Appellant be put to death for murdering their daughter. Appellant preserved this issue for review through a pretrial motion; he asked the trial court to declare 22 O.S.2001, § 984.1 unconstitutional insofar as it permits sentence recommendations by victims' families. The trial court refused. Appellant acknowledges that we have rejected this same claim many times before. *Jones v. State,* 2009 OK CR 1, ¶ 84, 201 P.3d 869, 890 ("This Court has previously upheld admission of the opinion of a victim impact witness as to the appropriateness of the death penalty as long as it is limited to the simple statement of the recommended sentence without amplification") (citations omitted). Appellant's arguments do not persuade us to revisit the issue. Proposition 10 is denied.

## XI. PROSECUTOR MISCONDUCT

▉ ¶ 71 In Proposition 11, Appellant claims the jury's sentence was unfairly influenced by several instances of prosecutor misconduct. Defense counsel timely objected to some of these comments; the others we re-

---

as defendant held her under water until she asphyxiated); *Harjo v. State,* 1994 OK CR 47, ¶ 59, 882 P.2d 1067, 1078 (aggravator established by evidence that victim's strangulation and suffocation was preceded by struggle); *Woodruff v. State,* 1993 OK CR 7, ¶ 105, 846 P.2d 1124, 1147 (aggravator supported by evidence that vic-

tim struggled with his assailants, was beaten with blunt instrument, and then strangled).

**28.** Appellant concedes that his jury received the most recent definition of "heinous, atrocious, or cruel," as formulated in *DeRosa,* 2004 OK CR 19, ¶ 96, 89 P.3d at 1156.

view only for plain error. *Pavatt,* 2007 OK CR 19, ¶ 61, 159 P.3d at 291.

### a. Arguing facts not in evidence.

 ¶ 72 Appellant complains that in both stages of the trial, the prosecutor improperly implied that he had partially shaved the victim's pubic area with a razor. The inference was based on the guilt-stage testimony of OSBI Criminalist Jolene Russell, who examined Jamie's body at the Medical Examiner's office. Russell noticed that the girl's pubic area appeared partially shaven, and saw loose hairs on that area of her body.[29] Also, an electric razor was found in Appellant's apartment. The inference was not improper, because it was reasonably based on the evidence. *Pavatt,* 2007 OK CR 19, ¶ 64, 159 P.3d at 291–92. While the inference surely had no effect on the jury's finding of guilt, the prosecutor was also free to use the inference in the punishment stage to show that perhaps Appellant was not entirely forthcoming in his interview with police. And while the inference may have, to some degree, underscored the vile nature of the entire crime, it did not unfairly overshadow the other depraved things Appellant freely admitted to doing. There is no improper conduct or unfair prejudice here.

### b. Personal opinions on appropriate punishment.

 ¶ 73 Appellant complains that at various times and in various ways, the prosecutor argued that death was the only appropriate punishment in this case. Appellant did not object to these comments, so we review them only for plain error. It is improper for a prosecutor to give personal opinions on the appropriate verdict, by alluding to information that has not been properly

presented to the jury. *Glasgow v. State,* 88 Okl.Cr. 279, 289, 202 P.2d 999, 1004 (1949). However, it is entirely proper for a prosecutor, as the State's representative, to argue for a particular outcome based on the evidence introduced at trial. *Pavatt,* 2007 OK CR 19, ¶ 63, 159 P.3d at 291. We have reviewed the prosecutor's comments and find nothing improper about them. The prosecutor advanced the State's position that a death sentence was appropriate based on the evidence and testimony submitted. There was no misconduct, and hence no plain error here.

### c. Comments on the presumption of innocence.

 ¶ 74 Appellant faults the prosecutor for commenting, during *voir dire,* on the presumption of innocence. The prosecutor explained that the presumption was a "precious thing," and then went on to explain that it applies with equal force when the facts show that the accused is not "actually innocent." Appellant did not object to this comment, and reading the entire passage that Appellant quotes from, we find nothing improper about it.[30] The prosecutor certainly did not argue that the presumption of innocence was inapplicable or had been destroyed in this case; as noted, the comment was made in *voir dire,* before any evidence had been presented. The prosecutor was simply explaining that the presumption was the law's way of placing the burden on the State to produce evidence sufficient for a conviction. We find nothing improper or incorrect in this comment. *Dodd v. State,* 2004 OK CR 31, ¶ 24, 100 P.3d 1017, 1029.

### d. Displays of emotion.

 ¶ 75 During the prosecutor's closing argument in the guilt stage of the trial, de-

---

**29.** In guilt-stage closing argument, the prosecutor mistakenly referred to this observation as being made by the Medical Examiner. Appellant makes much of the fact that no "expert" determined that the victim's pubic area had been shaven, even though lay witnesses are competent to relate their own personal observations about such matters. 12 O.S.2001, §§ 2602, 2701; *see Rogers v. Sells,* 178 Okl. 103, 61 P.2d 1018, 1020 (1936) ("A lay witness may testify to an objective fact; he certainly has the right to use his senses the same as an expert witness").

**30.** For example, in the same passage, the prosecutor corrects some panelists' misunderstanding of the presumption: "[T]he reality is right now, you'd have to vote not guilty, because he's presumed innocent of the charges. Okay? You don't hear any evidence that convinces you otherwise, you have to find him not guilty is what the law says. Are you okay with that …?"

fense counsel objected, claiming that the prosecutor was "prancing around" in front of the jury and "screaming" at them. Defense counsel noted that the prosecutor appeared to be on the verge of tears. The trial court admonished the prosecutor not to get too close to the jury, and the prosecutor complied. Appellant claims the prosecutor's deportment was unfairly prejudicial to him, and relies on *Mitchell v. State*, 2006 OK CR 20, ¶¶ 96–101, 136 P.3d 671, 708–710 as authority. We find *Mitchell* to be quite distinguishable from the present case. In *Mitchell*, the prosecutor stood at the defense table, pointed directly at the defendant, and angrily addressed arguments to him personally. This conduct went on for some time, despite several objections by the defense. Here, however, the prosecutor's argument was not aimed at Appellant personally, but was properly directed to the jury. Appellant does not claim that the substance of the argument itself was improper. The prosecutor's comments may have been delivered with emotion, but no one could deny that emotionally-charged evidence had been presented in this trial. We review the trial court's handling of such matters for an abuse of discretion, *see Garrison v. State*, 2004 OK CR 35, ¶ 124, 103 P.3d 590, 611, and find that the court's discretion was not abused here.

¶ 76 Whether considered individually or cumulatively, the comments complained of above did not deny Appellant a fair trial. *Powell v. State*, 2000 OK CR 5, ¶ 151, 995 P.2d 510, 539. Proposition 11 is denied.

## XII. INEFFECTIVE ASSISTANCE OF COUNSEL

█ ¶ 77 Proposition 12, Appellant alleges that certain acts and omissions of his trial defense team denied him the right to effective assistance of counsel, as guaranteed by the Sixth Amendment to the United States Constitution. In conjunction with this claim, Appellant has timely submitted an Application for Evidentiary Hearing, pursuant to Rule 3.11(B)(3)(b), *Rules of the Oklahoma Court of Criminal Appeals,* 22 O.S., Ch. 18, App. (2011).[31] When a defendant on direct appeal challenges his trial counsel's performance, we employ the analysis promulgated in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). We begin with the presumption that trial counsel rendered reasonable professional assistance. The defendant must establish both deficient performance and prejudice, that is, (1) that his trial counsel's performance was objectively unreasonable under prevailing professional norms, and (2) that counsel's performance undermines confidence in the outcome of the trial. *Littlejohn v. State,* 2008 OK CR 12, ¶ 27, 181 P.3d 736, 744–45.[32]

¶ 78 Appellant claims trial counsel was deficient for (1) failing to object to certain physical evidence that he now claims was inadmissible; (2) failing to object to certain arguments by the prosecutors that he now claims were improper; (3) failing to challenge the application of the death penalty to the mentally ill; (4) failing to rebut claims made by the Medical Examiner about the possible sequence of injuries to the victim; (5) failing to present additional mitigating evidence; and (6) failing to rebut a suggestion that certain mental-health diagnoses could have been confirmed with neuroimaging testing, but were not. We have rejected the first three claims on their merits, finding (1) that the physical evidence seized from Appellant's apartment was properly admitted (Proposition 3); (2) that the prosecutors' arguments were not improper (Proposition 11); and (3) that the execution of those who may be mentally ill, but who are not legally insane, does not run afoul of the Constitution

---

**31.** Appellate counsel has also filed a Motion to Supplement the Application for Evidentiary Hearing with materials intended to rebut portions of the State's response to his ineffective-counsel claims. The motion to supplement is hereby **GRANTED.**

**32.** While *Strickland* is our guide, we stress that, at this juncture, we do not attempt to substitute a review of written materials presented by one party for full-blown adversarial testing. Our task here is make the preliminary determination of whether there is even reason to remand for such testing. Our rules only require that Appellant raise a "strong possibility" that trial counsel was ineffective—a burden less onerous than *Strickland's* Rule 3.11, *Rules of the Oklahoma Court of Criminal Appeals,* 22 O.S., Ch. 18, App. (2011); *Simpson v. State,* 2010 OK CR 6, ¶ 53, 230 P.3d 888, 905–06.

(Proposition 9). Because timely challenges on these issues by trial counsel would properly have been overruled, Appellant cannot show any prejudice from counsel's failure to make them. *Eizember*, 2007 OK CR 29, ¶ 155, 164 P.3d at 244.

¶ 79 We turn next to Appellant's claim that his trial counsel failed to present evidence to rebut aspects of the Medical Examiner's testimony. During direct examination in the guilt stage of the trial, the Medical Examiner, Dr. Yacoub, testified that based on her examination, she could not conclusively say whether Jamie Bolin was alive when Appellant sexually assaulted her, or when he attempted to decapitate her. This testimony was based on trauma to the girl's vaginal area, food material found in her airway, and embolism (air bubbles) detected in the blood vessels of her brain. Appellant had told police that after he suffocated Jamie, he did no more than touch his penis to her vagina, then attempted to decapitate her in the bathroom. The defense team had retained its own forensic pathologist, Dr. John Adams, to review the autopsy findings before trial. However, this expert was not called to testify. Appellant now claims his trial counsel should have presented Dr. Adams to explain why, in his opinion, it would have been impossible for Jamie to have been alive when her body was sexually assaulted or when she received severe injuries to her neck. The Application for Evidentiary Hearing includes reports from Dr. Adams to this effect.

¶ 80 Dr. Yacoub concluded that Jamie Bolin died from asphyxiation. Appellant does not contest that conclusion. Dr. Yacoub never offered detailed alternative scenarios for the order of traumatic injuries; she simply said she could not determine the exact sequence from her autopsy. She did, however, make it clear that the food matter in the girl's airway was probably due to unconscious regurgitation—not from the effects of having one's throat cut.[33] As for the genital trauma, Dr. Yacoub concluded that she "could not tell" whether it was inflicted when Jamie was "alive or dying or immediately after she died." As for the embolism, Dr. Yacoub could not say whether it occurred premortem or postmortem; she noted that it could have occurred from decomposition of the body.[34] She did conclude, however, that the fracture to Jamie's hyoid bone, in the neck, was a postmortem injury.

¶ 81 Appellant claims that Dr. Yacoub's testimony "undoubtedly strengthened" the State's case on the "heinous, atrocious, or cruel" aggravator. But if the Medical Examiner could not say whether Jamie was alive when certain injuries were inflicted, she certainly did not suggest that the girl was *conscious* when those injuries were inflicted. This is an important point—one that defense counsel made clear to the jury, several times, when cross-examining Dr. Yacoub.[35] The medical evidence corroborated Appellant's confession regarding Jamie's conscious and fierce struggle while being suffocated. In punishment-stage closing, the prosecutors argued, consistent with Appellant's confession, that Jamie's conscious physical suffering was supported by evidence of suffocation. While they also pointed out that the medical evidence left some questions about the completeness of Appellant's confession, those comments were fairly based on the evidence. *Robinson v. State*, 1995 OK CR 25, ¶ 26, 900 P.2d 389, 399. And as we have observed in

---

33. Dr. Yacoub testified: "*If a person was conscious* and food was trying to get into the airway, that person would cough out that food so the airway would be protected and only the air would be in the airway. If that reflex is absent, for whatever reason, then food can get into the airway." (Emphasis added.) "Q. So if I'm following what you're saying, it is more likely that the person was unconscious and that food came up and they were unable to—she was unable to get it out, clear her airway? A. That would be my opinion."

34. Dr. Yacoub testified: "Well, I observed air in the blood vessels of the brain. So that's a fact. How did this happen? There are potential scenarios. That air could have happened when the neck was being cut. The body was starting to decompose, and that's another possibility. This is just a postmortem change. . . . I could not tell if she was alive or dead when the air went to her blood vessels in the brain."

35. *E.g.*, "Q. You don't know, do you, Doctor, at what point, if any, Jamie Bolin was conscious, do you? A. Not being an eyewitness, I do not know when she became unconscious."

our discussion of Proposition 7, Appellant does not dispute that Jamie did, in fact, experience conscious physical suffering. The exact timing of the other injuries to the girl's body was not material to the single aggravating circumstance found by the jury.[36]

¶ 82 Under *Strickland*, we must begin with the presumption that trial counsel performed reasonably, and we must give due deference to strategic decisions made during the course of the trial. *Grant*, 2009 OK CR 11, ¶ 53, 205 P.3d at 22. When counsel is assailed for failing to present evidence, we consider whether counsel conducted a responsible investigation on the issues involved. A total failure to investigate a viable and relevant aspect of a defense is one thing; a tactical decision not to present certain evidence, after reasonable investigation, is another. When counsel has made an informed decision to pursue one particular strategy over another, that choice is "virtually unchallengeable." *Strickland*, 466 U.S. at 690–91, 104 S.Ct. at 2066; *Harris*, 2007 OK CR 28, ¶ 33, 164 P.3d at 1116.

¶ 83 It is not difficult to imagine a sound strategic reason for not calling Dr. Adams. First, defense counsel already made the most relevant point through cross-examination of Dr. Yacoub: that she could not point to any evidence refuting Appellant's description of when Jamie lost consciousness. Additional rebuttal of Dr. Yacoub's *admittedly inconclusive* findings about the trauma sequence was, arguably, a waste of time. If such rebuttal had been presented in the guilt stage (where Dr. Yacoub testified), it would have had no bearing on the jury's verdict that Appellant had murdered Jamie Bolin—a fact the defense had all but conceded. If it had been presented in the punishment stage, such testimony would have shifted the focus of the defense to what could reasonably be considered a collateral matter. In the pun-

ishment stage, the defense team focused on showing the jury that Appellant was not a continuing threat if confined to prison, and on showing why his life was worth sparing. Although the State had incorporated the guilt-stage exhibits and testimony into the punishment stage, actually calling a forensic expert to testify in detail about the same gruesome matters again—when the focus was now squarely on punishment—would arguably have distracted the jury in a way unfavorable to the defense. Appellant admitted to beating, suffocating, molesting, and practically decapitating Jamie Bolin. The exact order in which he committed these acts was not material, because by his own admission, Jamie struggled for some time before losing consciousness. Furthermore, regardless of timing, Dr. Adams's own forensic review firmly corroborates Dr. Yacoub's conclusion of vaginal trauma. This finding contradicts Appellant's version of events, and supports the prosecutor's claim that he was not entirely honest in his confession.[37] In several ways, having Dr. Adams testify might have done more harm than good. *Hanson v. State*, 2009 OK CR 13, ¶ 37, 206 P.3d 1020, 1031–32.

¶ 84 Appellant also claims that Dr. Adams should have been called during the pretrial suppression hearing to discredit the State's reliance on the "rescue doctrine" (see Proposition 1). He claims Agent Overby knew, or should have known, that Jamie was already dead (rendering the rescue doctrine inapplicable) because, in Dr. Adams's estimation, the "prominent odor of decaying flesh" should have been obvious upon opening the tub. Yet Dr. Adams had no personal knowledge of the crime scene. The undisputed evidence was that the body had been wrapped in sheets of plastic, that items of clothing lay on top of this bundle, that the tub was sealed with duct tape, that a strong

---

36. After recapping Appellant's own description of the suffocation, the prosecutor said, "And as horrible as it is, that's what you have to think about when you decide if Jamie Bolin, 10-year-old Jamie Bolin, suffered. There is no doubt, ladies and gentlemen, that she suffered great physical anguish and extreme mental cruelty." While trial defense counsel did not expressly concede that Bolin consciously suffered before her death, he offered only a general and half-

hearted challenge to the "heinous, atrocious, or cruel" aggravator, saying its elements were "problematic" and the facts open to dispute.

37. Dr. Adams concluded, "with reasonable medical certainty," that the child's vagina was, in fact, penetrated "by some object which produced tears in the hymen."

odor of air freshener permeated the closet, and that Overby only briefly opened a corner of the tub. In our view, Dr. Adams could not say with any degree of certainly what odor Overby should have detected.

¶ 85 In short, we discern sound strategic reasons for the defense team not calling its forensic pathologist, and in any event, we find no prejudice flowing from that decision. We find no strong possibility that the failure to present Dr. Adams as a witness affected the outcome of Appellant's trial.

¶ 86 Next, we consider Appellant's claim that trial counsel failed to present sufficient mitigating evidence. Appellant concedes that his trial team conducted extensive mitigation investigation, and that copious anecdotal evidence about his life history was presented through friends, family, co-workers, teachers, and others. The mitigation case comprises some 400 pages of transcript. Nineteen witnesses were called, including three mental-health experts. While a few witnesses (*e.g.* a jailer and a prison warden) were called specifically to rebut the State's "continuing threat" aggravator, by and large, the testimony about Appellant's mental disorders (consisting of both lay anecdotes and expert evaluation) advanced the defense case on several fronts simultaneously, illustrating in a more general fashion why Appellant's life should be spared. And the defense experts' own evaluations relied, to some degree, on anecdotal information from the same friends and associates that testified (and others who did not).

¶ 87 Appellant does not complain so much about the number or selection of lay mitigation witnesses that were called, as about whether they were asked the right questions. The prosecutors attacked the defense mitigation case by looking for discrepancies between the information Appellant's friends related in court, and the impressions that the experts received from the same sources. Those who grew up with Appellant, and those who associated with him in later years, gave example after example of his somewhat dysfunctional family environment and his social difficulties.[38] While the prosecutors may have quibbled here and there with the testimony, through cross-examination and argument, the State did not present a single witness to rebut these anecdotes, or to impeach the credibility of those relating them. And as we have observed, insofar as these witnesses illustrated Appellant's mental disorders, the State's own mental-health expert generally concurred in the diagnoses that the defense experts had reached after considering the same kind of information. Appellant's attempt to paint a sympathetic picture of his childhood and mental problems was largely successful in the end. Trial counsel thoroughly investigated and prepared a comprehensive case in mitigation. Counsel's decision not to ask different questions, or ask questions in a different way, will not be second-guessed.[39] *Strickland,* 466 U.S. at 690–91, 104 S.Ct. at 2066; *Harris,* 2007 OK CR 28, ¶ 39, 164 P.3d at 1118.

¶ 88 Appellant also claims trial counsel should have rebutted the State's insinuation that neuroimaging testing could have been undertaken to confirm certain diagnoses made by the defense experts. In a brief exchange, the prosecutor asked the State's mental-health expert, Dr. Meloy, if such testing could have confirmed "some of those things" in the experts' reports; Meloy said it could have, but apparently it was not done. That was the extent of testimony regarding neuroimaging. It is not clear exactly what aspects of the defense diagnoses might have been at issue. As noted, Dr.

---

38. The one person Appellant claims should have been called to testify, but was not, would have offered information that was either cumulative to other testimony or contradictory to it. Appellant now proffers the affidavit of Randy White, a friend who was not called to testify. Appellant claims that many of White's anecdotes "corroborate" those of witnesses who were, in fact, called. White also describes Appellant as appearing slow-witted. This subject was much more thoroughly explored by the defense experts, who testified that Appellant was of above-average intelligence, but had disorders that impaired his social function.

39. In punishment-stage closing argument, defense counsel told the jury: "And you've heard from all witnesses that I mentioned in my opening with the exception of two. And frankly, we thought those people were cumulative to what you've already heard."

Meloy did not dispute the diagnoses of the defense experts; he merely disagreed with some of their conclusions about whether Appellant constituted a continuing threat to society.[40] And ultimately, the jury rejected that aggravating circumstance. We find no strong possibility that expert rebuttal to this isolated comment could have affected the outcome of the trial.

¶ 89 In summary, the supplementary materials Appellant has presented to this court do not show a strong possibility that trial counsel was ineffective, to the extent that additional fact-finding on the issue would be warranted. Proposition 12 is denied, and Appellant's request for an evidentiary hearing on his claims of ineffective counsel is also denied. Rule 3.11, *Rules of the Oklahoma Court of Criminal Appeals*, 22 O.S., Ch. 18, App. (2011); *Simpson v. State*, 2010 OK CR 6, ¶ 53, 230 P.3d 888, 905–06.

## XIII. CUMULATIVE ERROR

¶ 90 In Proposition 13, Appellant claims that the cumulative effect of all errors identified above denied him a fair trial. Because we have found no error, we likewise find no error by accumulation. *Rojem*, 2009 OK CR 15, ¶ 28, 207 P.3d at 396. This proposition is denied.

## MOTION FOR NEW TRIAL

■ ¶ 91 During the pendency of his appeal, Appellant filed a Motion for New Trial in this Court, alleging that newly-discovered evidence warrants reversal of his conviction. Appended to this motion are documents that Appellant has gathered in support of his claim. A defendant may file a motion for new trial when "new evidence is

discovered, material to the defendant, and which he could not with reasonable diligence have discovered before the trial." 22 O.S. 2001, § 952(7). When such a motion is filed during the pendency of a direct appeal, it shall be filed with this Court, not the district court. Rule 2.1(A)(3), *Rules of the Oklahoma Court of Criminal Appeals*, 22 O.S., Ch. 18, App. (2011). Such a motion must in any event be filed within one year of the imposition of Judgment and Sentence. 22 O.S.2001, § 953. Appellant's motion was timely filed.[41] The State filed a response on October 30, 2009.

¶ 92 Appellant's sole claim in the motion for new trial is that one juror empaneled to try his case withheld relevant information during the jury selection process. He contends that Juror G. was "selective" in disclosing his prior contacts with the legal system. Appellant compares G.'s answers on the juror questionnaire, and his responses during general *voir dire*, with public records showing additional, undisclosed contacts between himself or members of his family, and police or the courts. Appellant contends that G.'s omissions were intentional, and that such deception made him challengeable for cause. Alternatively, he claims G.'s omissions kept him from exercising peremptory challenges in an intelligent manner.

■ ¶ 93 When a defendant claims that newly-discovered evidence warrants a new trial, we consider the following factors: (1) whether the evidence could have been discovered before trial with reasonable diligence; (2) whether the evidence is material; (3) whether the evidence is cumulative; and (4) whether the evidence creates a reasonable probability that, had it been introduced at

---

**40.** Appellant claims Dr. Meloy "launched a fierce attack" on the specific diagnoses of Schizotypal Personality Disorder and Bipolar II Disorder, opining that neuroimaging testing was "necessary" to confirm these diagnoses, and that the defense experts knew that to be the case. A review of the record does not support this characterization. On cross-examination, defense counsel had implied that Meloy was not qualified to comment on the findings of Dr. McGarrahan, one of the defense experts, because McGarrahan was a neuropsychologist, and Meloy was not. In fact, Meloy admitted he did not have "any disagreement" with McGarrahan's neuropsycholog-

ical evaluation. At the end of redirect, Dr. Meloy was asked two brief questions about neuroimaging; he did not specify what particular diagnoses such testing might have shed light on.

**41.** Appellant's Motion for New Trial was filed on the anniversary date of his sentencing—April 3, 2009. The motion was timely filed on the last day before expiration of the one-year period. *See* Rule 1.4, *Rules of the Oklahoma Court of Criminal Appeals*, 22 O.S., Ch. 18, App. (2011); *Quick v. City of Tulsa*, 1975 OK CR 220, ¶ 7, 542 P.2d 961, 964.

trial, it would have changed the outcome. *Ellis v. State*, 1992 OK CR 45, ¶ 50, 867 P.2d 1289, 1303. We may resolve the issue based on the supplementary materials presented by the parties, or remand for an evidentiary hearing if necessary to adjudicate the claim. Rule 2.1(A)(3), *Rules of the Oklahoma Court of Criminal Appeals* ¶ 22 O.S., Ch. 18, App. (2011).

 ¶ 94 The right to a fair trial, guaranteed to every litigant, includes the right to a body of impartial jurors. *Irvin*, 366 U.S. 717, 81 S.Ct. 1639. The law recognizes that prospective jurors may be excused for either implied bias or actual bias. Bias is implied for any of several statutory grounds, generally involving some relation between the prospective juror and the defendant or complaining witness, or the juror's prior involvement with the case itself. 22 O.S.2001, § 660. A juror may also be excused for more subjective reasons which fall under the label of actual bias, *i.e.*, "the existence of a state of mind on the part of the juror, in reference to the case, or to either party, which satisfies the court, in the exercise of a sound discretion, that he cannot try the issue impartially, without prejudice to the substantial rights of the party challenging...." 22 O.S.2001, § 659. While allegations of actual bias usually involve a perceived prejudice against one party or another, a juror may also demonstrate bias "in reference to the case," *i.e.*, some personal interest in influencing the outcome of the trial, irrespective of the parties, that jeopardizes the guarantee to an impartial body of fact-finders. *See e.g. Dyer v. Calderon*, 151 F.3d 970 (9th Cir.1998) (juror's false answers during *voir dire* demonstrated bias which denied defendant a fair trial,

even though the juror's motives for lying were unclear).

 ¶ 95 Trial judges enjoy considerable discretion in deciding whether to excuse a juror for cause. *Young v. State*, 1998 OK CR 62, ¶ 9, 992 P.2d 332, 337. While a trial court may, in its discretion, excuse a prospective juror for omitting (or even intentionally lying about) certain information during *voir dire*, that does not mean that the same omissions automatically warrant a new trial when they are discovered at a later date.[42] The constitutional guarantee is to a body of disinterested jurors. Even when a juror's answers in *voir dire* are shown to have been deliberately misleading, a new trial is only required when the record casts sufficient doubt on the juror's ability to be impartial. "The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." *McDonough Power Equipment v. Greenwood*, 464 U.S. 548, 556, 104 S.Ct. 845, 850, 78 L.Ed.2d 663 (1984).

> It is well settled that, as a general rule, a verdict will not be set aside for reasons that would be sufficient to disqualify on a challenge for cause which existed before the juror was sworn, but which was unknown to the accused until after the verdict, unless it appears from the whole case that the accused suffered injustice from the fact that the juror served in the case.

*Stouse v. State*, 6 Okl.Cr. 415, 430, 119 P. 271, 277 (1911).

¶ 96 We have reviewed the trial record, the materials Appellant has attached to his motion for new trial, and an affidavit from Juror G., explaining the omissions, which the State has attached to its response.[43] Appellant's

---

**42.** Evidence of juror bias may arise during *voir dire* or during trial, in which case the defendant may claim on appeal that the trial court should have excused a panelist, removed a sitting juror and replaced him with an alternate, or granted a mistrial, as the case may be. The same statutory rules on bias are relevant in situations like this, where the evidence allegedly showing juror bias is not developed until after a verdict has been rendered.

**43.** Prospective jurors were asked if they had ever "appeared as a witness" in any court proceeding, and if they, an immediate family member, or a

close friend had been a defendant in any criminal case, or had been a victim of a crime. Juror G. wrote on his questionnaire that he and his family had been the victims of a burglary in 1989, and that he had testified in a burglary trial. He did not mention that in the mid-1990's, he and his wife were sued by their son over an insurance settlement awarded to the son after injuries sustained in an accident. In his affidavit, Juror G. explained that he didn't list being a "witness" in that case because he was a party to it: "I did not know being part of the case made me a witness." Such confusion is not uncom-

argument focuses primarily on G.'s failure to disclose that he was a named defendant in a civil action in the mid–1990's, and on a few domestic incidents apparently related thereto. Appellant claims the nature of these omissions shows that G. was trying to cast himself in a more acceptable light to the court. This may be true. But Appellant does not deny that during jury selection, G. willingly disclosed more than one incident where he was charged with a crime—one of which took place almost fifty years ago. Indeed, Appellant characterizes G. as having "many encounters with the legal system that might have made him appear unfit to serve on a jury," but concedes that G. freely admitted many of them in open court. *See Dyer*, 151 F.3d at 973 ("For *voir dire* to function, jurors must answer questions truthfully. Nevertheless, we must be tolerant, as jurors may forget incidents long buried in their minds, misunderstand a question or bend the truth a bit to avoid embarrassment").

¶ 97 We must first consider whether the information presented is timely. *Ellis*, 1992 OK CR 45, ¶ 50, 867 P.2d at 1303. All of the "new" information Appellant submits is public record, and he does not explain why it was not collected and presented until now. We conclude that this material does not meet the criteria for being "newly discovered evidence." [44] *Phillips v. State*, 1954 OK CR 22, ¶ 24, 267 P.2d 167, 174.

¶ 98 Nevertheless, even if any of this information were truly new, we would find it is not material, and cannot reasonably be said to have affected the outcome of Appellant's trial. *Ellis*, 1992 OK CR 45, ¶ 50, 867 P.2d at 1303. Appellant does not contend that Juror G. had any relationship to, connection with, or bias toward or against any party or witness in this case. None of the juror's undisclosed incidents involve anything remotely similar to the charge herein. Rather,

---

mon among laypersons. In fact, during general *voir dire*, when asked again about being a *victim* of a crime, G. added that he had been a "party defendant"—he was arrested for assault with a deadly weapon almost 50 years ago, but the case was later dismissed. Juror G. then recalled "one other thing I need to tell you," which was that he had once shot at some burglars who broke into his home.

Juror G. omitted the fact that in 1992, his daughter had filed a police report against him for a "road rage" incident, and that a few months later, she was charged with making harassing phone calls to her mother (G.'s wife), apparently related to the civil suit involving G.'s son. In his affidavit, G. explained that these incidents "slipped [his] mind" at the time of Appellant's trial, and that "[a] lot of this just seemed like a family problem blown out of proportion." Appellant also presents a police report indicating that G.'s wife was one of two persons allegedly assaulted by a Mr. Williams in 1997. The outcome of this case is not known. Juror G. failed to list this incident when asked if anyone in his family had been the victim of a crime. Appellant also notes that G. had filed several routine burglary reports over the years, but failed to mention them. In his affidavit, G. explained that he ran a boat-repair business, and these were thefts of customers' property, not his own. The police reports Appellant has submitted support this explanation.

During general *voir dire*, Juror G. disclosed that he had been charged with receiving stolen property in the late 1970's, but said that he was cleared of wrongdoing: "And I guess I was arrested, they put me in jail. But they released me.... I don't know if that would be an arrest or

not." Appellant submits a copy of an Information showing that G. was *charged* with receiving stolen property in 1979. However, Appellant does not dispute G.'s description of the outcome. All Appellant has shown is that G. was confused on how far the case went before being dismissed.

44. As we have noted, the heart of Appellant's argument is G.'s failure to disclose his involvement in a civil lawsuit in the mid–1990's. That fact was instantaneously accessible from online dockets. Appellant also submits substantial excerpts from transcripts of the civil proceedings, but his primary claim is a willful failure to disclose; the transcripts are offered merely to show that the civil suit was substantial enough that G. could not have simply forgotten about it. The balance of Appellant's materials are police reports, court pleadings, and docket sheets. Juror G. filled out the juror questionnaire on the first day of jury selection. He cleared the initial hurdle of individual death-qualification *voir dire* on the second day. General *voir dire* began about five days later. The presentation of evidence took about two weeks. Had defense counsel presented information about the civil case during general *voir dire* or even during trial, the trial court could have held a hearing on the matter, and if G. had been examined and his explanations were found wanting, the court might have exercised its discretion by replacing G. with an alternate. The fact that none of this happened does not mean that trial counsel performed deficiently. We simply observe that, so far as we can tell, the information Appellant claims is "newly discovered" was readily available when his trial began.

Appellant claims that G.'s omissions show a bias "in reference *to the case* ... [such] that he cannot try the issue impartially." 22 O.S. 2001, § 659(2) (emphasis added). Appellant concedes that, even with all the information he has discovered, he cannot discern what motive G. might have had for wanting to be a juror in this case. We cannot find one, either.

¶ 99 Any doubts about a juror's impartiality should be resolved in favor of the accused. *Grant,* 2009 OK CR 11, ¶ 12, 205 P.3d at 22. Even if we assume, for the sake of argument, that all of G.'s omissions were intentional, we see no hint that he might have harbored any bias toward or against anyone involved in this trial. Nor were G.'s omissions so egregious that one might reasonably detect some personal interest in serving on the jury, and a willingness to commit perjury to do so.[45] Appellant has not presented any reason to believe that G. would have been removable for bias of any kind. Hence, Appellant has not shown that G.'s omissions were material to conducting a fair trial. *Ellis,* 1992 OK CR 45, ¶ 50, 52, 867 P.2d at 1303.

¶ 100 Finally, we turn to Appellant's claim that Juror G.'s omissions prevented him from intelligently exercising his peremptory challenges. In other words, Appellant claims that even if G. was not removable for cause, the information he failed to disclose was such that Appellant would have removed him peremptorily, had Appellant known it before the jury was seated. In *Manuel v. State,* 1975 OK CR 174, 541 P.2d 233, a juror failed to disclose during *voir dire* that he was married to the chief secretary in the prosecu-

tor's office. While defense counsel may not have specifically asked about such relations, his questions were close enough that they should have prompted a positive response from the juror (if not a realization by the prosecutor himself). We held that the defendant was entitled to a new trial, finding that he was, "at the very least," deprived of information relevant to his intelligent use of peremptory challenges, "for we do not doubt that any defense attorney would so challenge a prospective juror with such a kinship to an employee of his adversary." *Id.* at ¶ 7, 541 P.2d at 237. But we did not grant relief in *Manuel* simply because the defendant claimed such information, had he possessed it timely, would have altered his use of peremptories. We granted relief only after considering whether the defendant was in fact prejudiced by the nondislosure, observing that the juror's relationship "approached being a basis for a challenge for cause," and that "all doubts regarding juror impartiality must be resolved in favor of the accused." *Id.* at ¶ 8, 541 P.2d at 237.

¶ 101 A similar situation occurred in *Tibbetts v. State,* 1985 OK CR 43, 698 P.2d 942. There, a juror failed to disclose several relevant facts which should have come to mind during *voir dire.* The juror responded negatively when asked if any members of her family had been the victim of a crime similar to the ones on trial: rape, sodomy, kidnapping. As it turned out, the juror's daughter had been the victim of an indecent exposure. The juror in *Tibbetts* also failed to mention that her son-in-law was a deputy sheriff, who had a job application pending with the district attorney's office at the time of trial—

---

**45.** Appellant's reliance on *Dyer v. Calderon* is sound for the general principle that a juror's deception may be so egregious that bias can be inferred. But the facts in *Dyer* are markedly distinguishable from those here. In what it described as a "rare case," *id.* at 984, the Ninth Circuit Court of Appeals in *Dyer* granted *habeas* relief to a state-court capital defendant. One juror had flatly denied *any* contacts between the criminal justice system and herself, or any close relative. When confronted during trial with newly-discovered information that her brother had been killed by another man, the juror dismissed the event as an "accident." *Id.* at 972–73. In truth, the juror herself had been the victim of numerous violent crimes, and practically every close male relative had been arrested for violent crimes. *Id.* at 980–81. As for her brother's "accidental" death, the juror had in fact filed a civil suit against his killer, and the killer had been convicted of a reduced charge of manslaughter after pleading guilty. *Id.* at 974, 975. The defense was tipped off about the juror's deception from the juror's own husband—who just happened to be in the same jail as Dyer, on charges of rape, at the time of Dyer's capital murder trial. *Id.* at 973–74. The Ninth Circuit concluded that the "magnitude of [the juror's] lies, and her remarkable display of insouciance ... fatally undermine our confidence in her ability to fairly decide Dyer's fate." *Id.* at 984.

and who, in fact, was present in the courtroom at times during the defendant's trial. Citing *Manuel*, we held that even though the new information was not such as to make the juror removable for cause, the "cumulative effect of the circumstances in the case at hand"—coupled with the principle that all doubts regarding juror impartiality must be resolved in favor of the accused—warranted a new trial. *Id.* at ¶¶ 10–11, 698 P.2d at 946.

¶ 102 New information about a juror's background or opinions can only be grounds for relief if it raises a doubt about the juror's ability to be fair and impartial.[46] As *Manuel* and *Tibbetts* illustrate, there may be situations where information about a juror, not obtained until after *voir dire*, might not have required removal of the juror for cause, but it is nevertheless of such importance, given all the circumstances of the case, that lingering doubt about the juror's fitness requires erring on the side of caution, and granting a new trial.[47] That is not the case here. As we have observed, Juror G.'s omissions had no relation to any party, witness, or issue in this case. The specter of bias raised in *Manuel* and *Tibbetts* is simply absent here. Juror G.'s omissions did not deny Appellant any substantial right. 20 O.S.2001, § 3001.1.

¶ 103 Considering the information available to us, and given our ability to resolve the issue by taking Appellant's factual allegations as true, we see no need for additional fact-finding in this case. Appellant's Motion for New Trial is therefore denied.

## MANDATORY SENTENCE REVIEW

¶ 104 Under Oklahoma law, this Court is required to review any death sentence to determine (1) whether the evidence supports the sentencer's finding of aggravating circumstances, and (2) whether, despite any aggravating circumstances, the sentence of death was improperly imposed under the influence of passion, prejudice, or any other arbitrary factor. 21 O.S.2001, § 701.13.

¶ 105 We have found no error in the evidence, instructions, or argument presented in either stage of the trial. We have concluded that the evidence was sufficient to support the one aggravating circumstance found by the jury. There is no reason to believe that the jury's imposition of the death sentence was the result of any improper factor. The conviction and sentence imposed by the jury are therefore **AFFIRMED.**

## DECISION

¶ 106 The Judgment and Sentence of the district court is **AFFIRMED.** Pursuant to Rule 3.15, Rules of the Oklahoma Court of Criminal Appeals, 22 O.S., Ch. 18, App.

---

**46.** By definition, peremptory challenges need no objective justification for their use. *See* 22 O.S. 2001, § 654 ("A peremptory challenge ... is an objection to a juror for which no reason need be given, but upon which the court must excuse him"). Hence, an objective *post hoc* analysis of how they might have been used differently is virtually impossible.

**47.** While some language in our prior cases might suggest that impairing a defendant's right to intelligently exercise peremptory challenges results in a *per se* denial of a fair trial, such declarations cannot be taken out of the context in which they were made. The statement is found in *Perez Enriquez v. State*, 1987 OK CR 164, 740 P.2d 1204, where we held that a juror's belated realization that she had several personal reasons to be prejudiced against the defendant's sister, who turned out to be a key alibi witness, warranted a new trial. *Perez Enriquez* cites *Bass v. State*, 1987 OK CR 29, 733 P.2d 1340, for the proposition that "[d]epriving defense counsel of information that could lead to the intelligent use of a peremptory challenge is a denial of an appellant's right to a fair and impartial jury." *Perez Enriquez*, 1987 OK CR 164, ¶ 7, 740 P.2d at 1206. In *Perez Enriquez*, we did not decide whether the juror was removable for cause, but concluded that doubts about her fitness had to be resolved in favor of granting a new trial. In *Bass*, a juror came forward during trial after realizing that his sister was engaged to one of the State's witnesses. The juror maintained that he could still decide the case impartially, and the court refused to declare a mistrial. On appeal, we did not find the trial court abused its discretion in accepting the juror's assurances, but did agree with the alternative claim that the juror's relationship to a key eyewitness bore on the defendant's ability to intelligently exercise peremptory challenges, expressly relying on "the principles announced in *Manuel* and *Tibbetts.*" *Bass*, 1987 OK CR 29, ¶ 5, 733 P.2d at 1342. As discussed above in the text, the analysis used in *Manuel* and *Tibbetts* considers all the relevant circumstances, and grants relief only if a doubt exists about the juror's impartiality.

(2011), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

A. JOHNSON, P.J., LEWIS, V.P.J. and SMITH, J.: concur.

LUMPKIN, J. concur in results.

LUMPKIN, Judge: CONCUR IN RESULT.

¶1 I concur in the Court's decision to affirm the judgment and sentence in this case and find the sentence of death supported by the law and evidence.

¶2 However, I do have concerns about the syntax used in describing our appellate review. As to Proposition 1, the opinion states "we review the district court's factual findings for clear error ..." when, in fact, on appeal, this Court reviews a trial court's ruling on the facts for an abuse of discretion. "An abuse of discretion has been defined as a clearly erroneous conclusion and judgment, one that is clearly against the logic and effect of the facts presented." *Marshall v. State,* 2010 OK CR 8, ¶24, 232 P.3d 467, 474 (*citing State v. Love,* 1998 OK CR 32, ¶2, 960 P.2d 368, 369). *See also Stouffer v. State,* 2006 OK CR 46, ¶60, 147 P.3d 245, 263 (*citing C.L.F. v. State,* 1999 OK CR 12, ¶5, 989 P.2d 945, 947); *Slaughter v. State,* 1997 OK CR 78, ¶19, 950 P.2d 839, 848–849 (*citing R.J.D. v. State,* 799 P.2d 1122, 1125 (Okl.Cr.1990)) (*quoting Stevens v. State,* 94 Okl.Cr. 216, 225, 232 P.2d 949, 959 (1951)). While the abuse of discretion standard includes an evaluation of whether the judge's decision is clearly erroneous, we have not adopted a separate standard labeled "clear error." We must be careful with the words we use due to the fact our readers evaluate those words for future arguments. Slight changes give rise to arguments that standards of review have changed when in fact they have not. I would just urge the Court to be consistent in the verbiage it uses to explain the methods utilized in analyzing issues on appeal.